UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., | |
| Plaintiff, | No. 14 Civ. 2355 (AJN) |
| v. | |
| BENJAMIN M. LAWSKY, in his official capacity as Superintendent of the New York State Department of Financial Services, | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Defendant. | |

## NATURE OF THE ACTION

1.      This action is a constitutional challenge to the State of New York's efforts to enforce its insurance law against Plaintiff American International Group, Inc. ("AIG") for certain activities conducted over various years prior to 2010 by American Life Insurance Company ("ALICO"), which was a wholly-owned subsidiary of AIG until November 1, 2010.[1]  The State of New York has the authority to regulate the business of insurance issued to insureds resident in New York.  It does not have authority to regulate the business of insurance issued to foreign insureds resident outside of the State of New York.  Yet New York officials, including those in the Department of Financial Services, have threatened to impose New York's insurance licensing requirements on AIG for ALICO's marketing of *foreign* life insurance products that are

---

[1]  In bringing this action, AIG does not concede liability for the activities of its former subsidiaries ALICO or Delaware American Life Insurance Company ("DelAm"), and reserves all rights in this regard.  Principles of corporate form and separateness normally would bar the Department from holding the parent, AIG, responsible for the activities of its subsidiaries, ALICO or DelAm, especially where, as here, the entities at issue are *former* subsidiaries now held by a new parent (*see* ¶ *2 infra*).

regulated by *foreign* insurance authorities and which cover exclusively *foreign* insureds located outside the State of New York and indeed outside the United States.

2.     Specifically, New York officials have advised AIG that they will initiate administrative proceedings and other actions in order to impose substantial monetary penalties on AIG based on the marketing of ALICO's foreign insurance products from and into New York, which the Department purports constituted an "insurance business" without a New York license and/ or the unauthorized aiding and abetting of an unlicensed insurer.  In fact, the Department has already stated in its March 31, 2014 Consent Order with the Metropolitan Life Insurance Company ("MetLife") (ALICO's current parent company) that AIG and its former subsidiaries violated the New York Insurance Law, specifically §§ 1102, 2102(a), and/or 2117.[2]   The Department has undertaken these enforcement actions against AIG and its former subsidiaries, despite express language in the New York Insurance Law that operations such as ALICO's are not subject to the State's insurance licensing scheme, and despite New York officials' longstanding practice of allowing ALICO and numerous other companies throughout the insurance industry to engage in such activities within the State of New York.

3.     Moreover, on information and belief, at the time ALICO was AIG's subsidiary, New York officials indicated that a company that did not write insurance for New York insureds was ineligible for a New York license.[3]   Indeed, New York's application for an insurance license

---

[2] In the Consent Order, attached hereto as Exhibit A, the Department finds that AIG, ALICO, and other former subsidiaries of AIG, such as DelAm, violated the New York Insurance Law.  *See* Ex. A, at p. 9 ¶ 18.  As set forth herein, the Department's position is based on a flawed and unconstitutional interpretation and application of the New York Insurance Law.

[3] The Department's March 31, 2014 Consent Order seems consistent with the view that a New York license is not available to a foreign insurer that does not provide insurance to New York insureds.  While the Consent Order permits MetLife and its subsidiaries to continue their activities and cryptically states that they will "work to come into full compliance with the New

makes clear on its face that eligibility for a license requires that the applicant intend to provide insurance to New York insureds.  This refusal to grant an insurance license to a foreign insurer writing insurance exclusively for foreign insureds, while simultaneously penalizing that insurer for marketing its foreign insurance products from or into New York without a New York license, creates a catch-22 that violates the U.S. Constitution in each of three ways:

4.      *First*, imposing upon AIG (as ALICO's former owner) New York's current interpretation of the New York Insurance Law violates the Due Process Clause of the Fourteenth Amendment.  Due Process requires that a statute or regulation have sufficient clarity to give the ordinary person fair notice of what is and is not prohibited.  As applied here, the New York Insurance Law violates these protections and is void for vagueness because no reasonably prudent person, familiar with the insurance industry and regulation, would understand the statutory scheme to require a New York insurance license for marketing insurance products that exclusively cover out-of-state (in fact, out-of-country) employees of multinational companies. Indeed, numerous insurance companies have long engaged in these types of activities in New York without a license, yet New York officials have elected to single out AIG and ALICO for a penalty.

5.      *Second*, penalizing AIG (as ALICO's former owner) under the Insurance Law for activity consisting solely of the marketing of contracts of insurance to and with foreign insureds violates the First Amendment protection of freedom of speech as applied to the States through the Due Process Clause of the Fourteenth Amendment.  Imposing a penalty for violating New York's insurance licensing requirements and other related provisions of the New York Insurance Law for such pure marketing activities, particularly in the absence of any allegation that the

---

York Insurance Law," *see* Ex. A, at p. 11 ¶¶ 5-6, the Order nowhere states that they will obtain an insurance license.

speech at issue was false, misleading or anything other than entirely truthful and accurate, would constitute a content-based restriction on commercial speech that is unjustified by any legitimate or important state interest.

6.      *Third*, the statutory and regulatory scheme that New York officials propose to apply here also unconstitutionally discriminates against out-of-state and foreign commerce in violation of the dormant Commerce Clause, U.S. Const. art. I, § 8.  This is so under either or both of the two horns of the dilemma New York officials have imposed:  If the New York Insurance Law and related regulations are interpreted to *preclude* the issuance of a New York insurance license to a company that markets from or into New York insurance products that exclusively cover foreign insureds and maintains no insurance premiums in New York, then the statutory scheme would amount to facial discrimination against out-of-state commerce.  If, on the other hand, the New York Insurance Law and related regulations are interpreted to *require* such entities to provide insurance to New York residents in order to obtain a license in New York, then it would likewise amount to facial discrimination against out-of-state commerce by requiring a foreign insurer who wishes to market from or into New York to involuntarily enter insurance contracts with New York insureds rather than writing policies covering exclusively foreign insureds and paying premiums outside the State of New York.  Such discrimination is virtually *per se* invalid and at a minimum would require a compelling state interest.

7.      The Department has identified no legitimate state interest justifying its unprecedented attempt to expand its regulatory reach, much less an important or compelling state interest.  In its Consent Order with MetLife, the Department does not identify a single harm to a single insurance consumer (in New York or otherwise), nor does it allege that the activities at issue somehow threatened the stability of the New York insurance market.  Moreover, the

4

agreement contains a detailed safe harbor provision apparently designed to allow ALICO to carry on its business without substantial interruption, notwithstanding the fact that it appears that ALICO cannot obtain a New York license.  Indeed, according to MetLife's recent SEC Form 10-Q, the Consent Order "allows the Company, through an authorized insurer, to continue activities in New York related to its global employee benefits business through January 30, 2015.  The Company is seeking legislation to allow for such activities beyond that date."[4]  Thus, the Department's purported interest in prohibiting the activities in question is undermined by the terms of its own Consent Order.

8.      By this action, AIG seeks a declaratory judgment that the New York Insurance Law's licensing requirements and related provisions that govern certain entities' activities in New York on behalf of unauthorized insurers are unconstitutional as applied to AIG with respect to the ALICO conduct described in the MetLife Consent Order.  Specifically, these provisions, as applied, (i) violate the Due Process Clause because they do not give fair notice that the marketing of foreign insurance products to and with foreign insureds is prohibited; (ii) violate the First and Fourteenth Amendments because they unduly restrict commercial speech unjustified by any legitimate state interest; and (iii) violate the dormant Commerce Clause because they regulate the sale of foreign insurance covering foreign insureds located outside the State of New York and regulated by foreign insurance authorities in a way that discriminates against foreign commerce.

9.      By this action, AIG also seeks preliminary and permanent injunctive relief prohibiting the State of New York, through its officials, from commencing or continuing any proceeding (administrative or otherwise) or imposing any penalty (monetary or otherwise)

---

[4] Relevant excerpts of MetLife, Inc., Quarterly Report (Form 10-Q) (Mar. 31, 2014) are attached as Exhibit B.

against AIG for ALICO's failure to obtain a license for purportedly "doing an insurance business" under the New York Insurance Law or otherwise acting on behalf of an entity "doing an insurance business" without a New York license.

## THE PARTIES

10.     Plaintiff AIG is a Delaware corporation with its principal place of business in New York, New York.  Prior to November 1, 2010, ALICO, a Delaware corporation, was Plaintiff's wholly-owned subsidiary.  ALICO was acquired by MetLife on November 1, 2010. During the time that it was owned by AIG, ALICO, through its branches and subsidiaries in more than 50 countries, underwrote, issued, and delivered a range of life and health insurance products, including traditional life, variable life, annuities, pensions, personal accident insurance and group insurance for large and small organizations.  ALICO's foreign life insurance products were marketed by the Group Management Division ("GMD"), which described itself as marketing products and services of group life insurance companies, including ALICO, throughout the world.

11.     Defendant Benjamin M. Lawsky is the Superintendent of the New York State Department of Financial Services.

12.     Non-party New York State Department of Financial Services (together, with Defendant Lawksy, referred to as the "Department" or "DFS") is an agency of the State of New York that regulates New York's financial services industry in order to guard against financial crises and to protect New York consumers and markets from fraud.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331 (federal question) because this action involves interpretation of the

Commerce Clause of the United States Constitution (U.S. Const. art. I, § 8) and the First and Fourteenth Amendments to the United States Constitution (U.S. Const. amend. I, XIV), and because the action seeks to prevent state officials from interfering with federal rights.

14.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff's principal place of business is located in New York, New York, and most of the conduct that underlies this action occurred in New York, New York.

15.     There is a present and actual controversy between the parties.

16.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), 28 U.S.C. § 1651(a) (injunctive relief), and 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution).

## SUBSTANTIVE ALLEGATIONS

## I.     THE STATUTORY AND REGULATORY SCHEME

17.     Section 1102 of the New York Insurance Law provides that "[n]o person, firm, association, corporation, or joint-stock company shall *do an insurance business* in this state unless authorized by a license in force pursuant to the provisions of this chapter, or exempted by the provisions of this chapter from such requirement."   N.Y. Ins. Law § 1102(a) (emphasis added).

18.     The definition of "insurance business" is set forth in Section 1101(b) of the New York Insurance Law, which provides:

> [A]ny of the following acts *in this state*, effected by mail from outside this state or otherwise, by any person, firm, association, corporation or joint-stock company shall constitute *doing an insurance business* in this state and shall constitute doing business in the state within the meaning of section three hundred two of the civil practice law and rules:
> (A) making, or proposing to make, as insurer, any insurance contract, *including either* issuance or delivery of a policy *or* contract of insurance to *a resident of this state* or to any firm, association, or corporation authorized to do business herein, or *solicitation of applications* for any *such* policies or contracts;

(B) making, or proposing to make, as warrantor, guarantor or surety, any contract of warranty, guaranty or suretyship as a vocation and not as merely incidental to any other legitimate business or activity of the warrantor, guarantor or surety;

(C) collecting any premium, membership fee, assessment or other consideration for any policy or contract of insurance;

(D) doing any kind of business, including a reinsurance business, specifically recognized as constituting the doing of an insurance business within the meaning of this chapter;

(E) doing or proposing to do any business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of this chapter.

N.Y. INS. LAW § 1101(b)(1)(A)-(E) (emphases added).

19.     With respect to insurance contracts, the language of Section 1101(b) is explicit. The making of, or proposal to make, insurance contracts in New York—which includes the issuance or delivery of policies or contracts from out-of-state insurance companies to New York residents—constitutes doing an "insurance business."  *See* N.Y. INS. LAW § 1101(b)(1)(A) ("any of the following acts *in this state* . . . shall constitute *doing an insurance business* . . . : making, or proposing to make, as insurer, any insurance contract, including *either* issuance or delivery of a policy or contract of insurance to *a resident of this state or* to any firm, association, or corporation authorized to do business herein") (emphasis added).

20.     The statute is equally clear as to solicitation of insurance contracts—it applies only to solicitation of "such" contracts, meaning insurance contracts made in New York and issued or delivered to New York residents or companies.  *See* N.Y. INS. LAW § 1101(b)(1)(A) ("or solicitation of applications for any *such* policies or contracts") (emphasis added).  Thus, by the statute's plain terms, there are two, and only two, ways that an individual or entity does an "insurance business" under § 1101(b)(1)(A):  "*either*" by issuing or delivering a policy or contract of insurance to a New York resident or firm, association, or corporation authorized to do

8

business in New York, "*or*" by "solicitation of *applications* for any *such* policies or contracts."
(Emphases added).

21.     Section 1101 thus makes clear that the New York Insurance Law is concerned
with protecting *New York* consumers from unscrupulous insurance companies selling fraudulent
or unregulated products.  The legislative history of Section 1101 and the related Section 1102
(discussing the requirements for an insurer's license) confirms this principle.  *See* Memorandum
from Richard E. Stewart, Superintendent of Ins., to Governor of N.Y. (May 1, 1970) ("The 1969
bill was similar to the current bill in its intent *to protect residents of this state* from mail
solicitations from unauthorized insurers whose responsibility and soundness is questionable.")
(emphasis added); *id.* ("The bill's salutory effect is to require foreign insurers to qualify under
our laws before they may *solicit our residents*") (emphasis added); Governor's Mem. approving
A. 3786, ch. 295, 1970 ("This bill, adopted upon by recommendation, will provide *New York
consumers* with protection from financially unsound and irresponsible insurance companies
soliciting business by mail from out-of-state.") (emphasis added); N.Y. Bill Jacket, 1970 A.
3786, ch. 295 (Governor's Mem.) ("The purpose of the bill is to protect *residents of this state*
from solicitation by mail by insurance companies which may be financially unsound or
irresponsible.") (emphasis added); *see also* 1993 N.Y. Sess. Laws ch. 663 (McKinney) ("The
legislature hereby finds and declares that a principal goal of effective insurance regulation must
be to allow *citizens of this state* reasonable access to financially sound and reliable insurers for
their insurance coverage needs.") (emphasis added); Ins. Law Revision of the State of N.Y.
(Tentative Draft) § 50.3 cmt., at 106 (1937) ("[T]he chief concern of the State of New York is
the regulation of insurance on property on risks within its borders.").

22.     Nothing in the language or legislative history of the New York Insurance Law extends the definition of "doing an insurance business" so far as to reach the marketing activities at issue here, which involved insurance contracts issued outside of New York to and on behalf of non-New York insureds. Nor is there any allegation that ALICO's policies were fraudulent or otherwise improper.

23.     New York's licensing process is governed by the Uniform Certificate of Authority Application ("UCAA"), which would have required ALICO to file a UCAA expansion application to obtain a license.  For such an application to be accepted, ALICO would have been required to comply with a number of provisions, including the disclosure of information specific to the selling of insurance *to New York residents*.  Such information includes but is not limited to the following:

- Product lines currently sold or planned;
- Specialty line or lines currently sold and planned;
- Marketing plan (including how New York state fits into ALICO's overall plan);
- Detailed description of planned advertising;
- Current and expected competition (both regionally and nationally);
- Plan of operations (including how policies will be underwritten and cancelled; premiums will be handled; and personnel will be trained, supervised, and compensated);
- Three-year premium and loss projections for each line of business;
- Minimum capital and surplus requirements;
- Statutory deposit requirements.

24.     Since ALICO did not write insurance for New York insureds, ALICO could not provide most of the information required to obtain a New York license and thus could not have expected to need such a license, nor been eligible for such a license according to the statutory and regulatory terms.

25.     At the time ALICO was AIG's subsidiary, officials from the Department indicated that a company like ALICO was ineligible for a New York insurance license.

26.     Sections 2117(a) and 2102(a) of the New York Insurance Law are also at issue here, because, as set forth below, DFS has already concluded in the Consent Order that AIG violated these provisions.  Section 2117(a), which effectively prohibits the aiding and abetting of violations of § 1102, provides as follows:

> No person, firm, association or corporation shall in this state act as agent for any insurer or health maintenance organization which is not licensed or authorized to do an insurance or health maintenance organization business in this state, in the doing of any insurance or health maintenance organization business in this state or in soliciting, negotiating or effectuating any insurance, health maintenance organization or annuity contract or shall in this state act as insurance broker in soliciting, negotiating or in any way effectuating any insurance, health maintenance organization or annuity contract of, or in placing risks with, any such insurer or health maintenance organization, or shall in this state in any way or manner aid any such insurer or health maintenance organization in effecting any insurance, health maintenance organization or annuity contract.

27.     Section 2102(a) provides that "[n]o person, firm, association or corporation shall act as an insurance producer . . . in this state without having authority to do so by virtue of a license issued and in force pursuant to the provisions of this chapter."  An "insurance producer" is defined as an "insurance agent, insurance broker . . . or any other person required to be licensed under the laws of this state to sell, solicit, or negotiate insurance," *see* N.Y. INS. LAW § 2101(k), and an "insurance agent" is "any authorized or acknowledged agent of an insurer . . . who acts as such in solicitation of, negotiation for, or sale of, an insurance . . . contract, other than as a licensed insurance broker," *see id.* § 2101(a).

28.     In the context of New York's overall insurance regulatory and statutory framework, §§ 2117 and 2102 are designed to *protect New York consumers* from certain conduct by (i) unlicensed individuals and (ii) individuals on behalf of unlicensed insurers.  Thus, as with § 1102, in order for these provisions to be applicable, the insurance activities must be directed at or effect New York insurance consumers or risks.

11

## II.     ALICO'S ACTIVITIES

29.     ALICO was incorporated under the laws of the State of Delaware on August 18, 1921 as the Asia Life insurance Company, with its principal office located in Shanghai, China.

30.     In 1951, ALICO amended its Certificate of Incorporation to change the corporate title to American Life Insurance Company and to change the principal office to Bermuda.  In 1969, ALICO again relocated its principal office, this time to Wilmington, Delaware.

31.     ALICO's foreign life insurance products were marketed by GMD, which described itself as marketing products and services of group insurance life companies throughout the world.  Over the years, GMD operated under different monikers, but the essential activities of its personnel remained similar.

32.     Much of the marketing of ALICO's insurance products occurred in New York, and most senior GMD employees were based in New York and Delaware.  Neither ALICO nor GMD was licensed to "do an insurance business" in New York.

33.     Marketing by GMD personnel included presentations to and discussions with multinational clients, by phone, email, and in person, in an effort to assess their needs for foreign products in foreign operations and to discuss ALICO's capabilities regarding those products and operations. These calls, emails, and meetings usually were initiated either by GMD personnel contacting offices of U.S.-based multinational corporations which were known to have foreign operations in countries where ALICO could provide group employee benefit packages or pension products, or by existing or potential clients themselves.

34.     If the corporation was interested in an employee benefits package for one or more of its foreign operations, GMD personnel in the U.S. would provide information to the U.S. contact in that corporation regarding the availability of ALICO subsidiaries, and at times, specific ALICO insurance products, in the relevant countries.  GMD personnel also would either

refer the lead to GMD counterparts in its local (foreign) offices who would follow up by contacting the local (foreign) operation of the U.S.-based corporation, or provide a proposal from a local (foreign) insurer directly to the U.S. contact.  If the transaction was consummated between the foreign operation and the non-U.S. ALICO branch or subsidiary, the policy would be underwritten, issued and delivered and the premium would be received in that foreign jurisdiction by the ALICO licensed insurance entity, and would be subject to regulation by the insurance authorities in that jurisdiction.

35.     With respect to ALICO's insurance products prior to November 1, 2010, all key aspects of insurance policy issuance and delivery—underwriting, contracting, and premium collection—occurred outside of New York.

36.     At no time prior to November 1, 2010, was the marketing, solicitation, or sale of insurance products to New York insureds part of ALICO's business or GMD's marketing of ALICO's insurance products.  Nor at any time prior to November 1, 2010, did ALICO or GMD maintain any premiums for insurance in the State of New York.

37.     Although the above marketing activities were openly conducted in New York for many decades, at no time prior to November 1, 2010, did the Department, its predecessor, or any official thereof require AIG, GMD, or ALICO to obtain a license pursuant to New York Insurance Law § 1102(a) to engage in the above activities.

38.     Accordingly, at no time prior to November 1, 2010, did ALICO seek or obtain a license from the State of New York for "the doing of an insurance business."

## III.     THE DEPARTMENT'S ENFORCEMENT ACTION

39.     By its unambiguous terms, the New York Insurance Law has no application to a foreign insurer that markets only insurance products regulated by foreign insurance authorities

and covering exclusively foreign insureds located outside the State of New York and the United States.

40.     Nevertheless, the Department has recently informed AIG that, as it now interprets the New York Insurance Law, the marketing of ALICO's insurance products from or into New York violated that law because ALICO was unlicensed as a New York insurance business, and it now seeks to impose substantial monetary penalties on AIG for the purportedly illegal marketing activities that occurred in the State of New York prior to November 1, 2010.

41.     Specifically, in or about February 2013, the Department notified AIG and MetLife that it was investigating whether the marketing of ALICO's foreign insurance products to multinational corporations from offices in New York constituted doing an insurance business as defined by New York law without a license.

42.     On June 7, 2013, the Department indicated to AIG that it had summarily concluded that GMD's marketing of ALICO's insurance products in New York constituted unlicensed insurance business.  DFS asserted that, since the alleged violations date back several decades, AIG's and ALICO's potential civil penalty exposure under New York Insurance Law § 1102 is very substantial.

43.     The Department gave AIG a settlement proposal on October 21, 2013 to resolve its investigation into ALICO's activities.  At that time, the Department threatened that, if AIG refused to resolve the case, the Department would initiate formal enforcement proceedings against AIG.

44.     On March 31, 2014, Defendant Lawsky announced in a press release that DFS and MetLife had reached an agreement to settle the investigation into ALICO's activities as to MetLife.  The Consent Order (Ex. A) memorializing the agreement contains a detailed "Factual

Background" setting forth various allegations specifically naming and implicating AIG.  For example, the Consent Order alleges:

a.  "ALICO, while operating as a subsidiary of AIG in 2009, made intentional misrepresentations and omissions to [DFS's predecessor] concerning its insurance business activities in New York."  *Id.* at p. 4 ¶ 6.

b.  "ALICO's insurance activities prior to 2009 and to date" constituted "doing an insurance business in New York."  *Id.* at pp. 6-7 ¶ 14.

c.  Based on alleged conduct described in the Consent Order, *see id.* at pp. 7-9 ¶ 16, "ALICO, AIG, DelAm, and MetLife were soliciting insurance business in New York without a license."  *Id.* at p. 9 ¶ 17.

45.    In addition to setting forth factual findings, the Consent Order contains DFS's "conclusions" based on its new interpretation of the New York Insurance Law.  DFS "concluded that ALICO, DelAm, and certain AIG subsidiaries and affiliates have done an insurance business in New York without a license[,]" *id.* at p. 1, in violation of N.Y. INS. LAW §§ 1102, 2102(a) and 2117, *id.* at p. 9 ¶ 18.

46.    These factual allegations and legal positions are identical to those DFS has pressed against AIG in meetings and correspondence.  The message that DFS is sending is clear: AIG must settle or it will be subject to an enforcement proceeding.

47.    Indeed, the DFS-MetLife agreement is specifically contingent upon MetLife's unqualified commitment to "fully cooperate with DFS's investigation of … AIG concerning ALICO's, DelAm's and AIG's violations of sections 1102, 2102 and 2117 of the Insurance Law[.]"  *Id.* at p. 10 ¶ 4.  Specifically, in addition to paying a $50 million civil fine, *id.*  at p. 9 ¶ 1, MetLife must provide all non-privileged materials requested by DFS and make MetLife's

employees available for testimony requested by DFS related to "ALICO's and DelAm's doing insurance business in New York without a New York license prior to the Acquisition," *id.* at p. 10 ¶ 4.

48.     Thus, by the plain terms of the Consent Order, DFS has already concluded that AIG has violated the law; the only remaining question is *when* DFS will initiate enforcement proceedings against AIG.

49.     Accordingly, under the Department's new interpretation of the New York Insurance Law and related regulations, a company may not, without obtaining a New York insurance license, market insurance products in New York even if those products are regulated by foreign insurance authorities and cover exclusively foreign insureds located outside the State of New York.  But at the same time, a company engaged in exclusively foreign insurance business with no New York insureds or New York-based premiums is not eligible for a New York insurance license.  DFS's new interpretation thus imposes a catch-22:  it either bars the marketing of exclusively foreign insurance products in New York, or compels any business seeking to market such products involuntarily to also issue insurance to New York residents in order to obtain a New York insurance license as the price of doing business in the State of New York.

50.     Meanwhile, DFS also advances a similarly unconstitutional interpretation of New York Insurance Law §§ 2102(a) and 2117.  Specifically, DFS asserts that §§ 2102(a) and 2117 should be read so as to prohibit a company or individuals located in New York (who are not doing an insurance business in New York) from engaging in marketing activities in New York that are in no way directed at, or impact, New York consumers, but instead are focused solely on foreign citizens (outside the United States), unless the company and/or individuals first obtain

certain licenses from DFS and conform their activities to the substantive provisions of New York's Insurance Law designed to protect New York (as opposed to foreign) consumers. *See* Consent Order pp. 7-9.

51.     The Department's new interpretation of New York's licensing requirements (and related interpretation of §§ 2102(a) and 2117) is unconstitutional under the U.S. Constitution because it (i) violates the Due Process Clause of the Fourteenth Amendment as impermissibly vague because companies are deprived of reasonable notice of these requirements, (ii) violates the First and Fourteenth Amendments because it constitutes a content-based restriction on commercial speech that is unjustified by any legitimate or important state interest in regulating the New York insurance industry or protecting New York insureds, and (iii) violates the dormant Commerce Clause because it discriminates against foreign commerce without a compelling interest.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF DUE PROCESS AND 42 U.S.C. § 1983 (DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF)

52.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 51 as if fully set forth herein.

53.     Sections 1101(b)(1), 1102(a), 2102(a) and 2117 of the New York Insurance Law, as currently interpreted and applied by the Department, are unconstitutionally vague and fail to give fair notice of the requirements of those laws.

54.     As alleged above, Sections 1101(b)(1),1102(a), 2102(a) and 2117 do not provide a person of ordinary intelligence fair notice that a company that markets or solicits from or to New York insurance products regulated by foreign insurance authorities and covering insureds

17

located outside the State of New York and the United States is subject to New York's insurance licensing requirements and/or is prohibited from engaging in such activities in New York.

55.    Because of this vagueness, it was impossible for AIG to know during the period in which ALICO was one of its wholly-owned subsidiaries that ALICO was required to obtain a license under the New York Insurance Law.

56.    Any penalty for ALICO's purported violation of the New York Insurance Law would deprive AIG of its "rights, privileges and immunities," 42 U.S.C. § 1983, under the Due Process Clause, U.S. Const. amend XIV.

57.    An actual controversy exists between AIG and Defendant because Department officials, acting under color of law, have informed AIG that ALICO's failure to obtain a New York insurance license during the time in which it was AIG's wholly-owned subsidiary violated the New York Insurance Law and these officials, again acting under color of law, have further advised AIG that they will initiate administrative proceedings and other actions in order to levy substantial monetary penalties on AIG for this violation.  The settlement and Consent Order between the Department and MetLife, announced on March 31, 2014, which expressly states the Department's conclusion that AIG has violated the New York Insurance Law, *see* Ex. A, at 9 ¶ 18, further corroborates the concrete and imminent likelihood of an enforcement action against AIG and the existence of an actual and ripe controversy.

58.    Plaintiff seeks a declaration that Sections 1101(b)(1), 1102(a), 2102(a) and 2117 of the New York Insurance Law, as interpreted and applied by the Department to ALICO's foreign insurance contracts, are void for vagueness under the Due Process Clause of the Fourteenth Amendment.

59.     Plaintiff also seeks an injunction prohibiting Defendant from commencing or continuing any proceeding (administrative or otherwise) or imposing any penalty (monetary or otherwise) against AIG due to ALICO's failure, prior to November 1, 2010, to obtain a license pursuant to Sections 1101(b)(1) and 1102(a) of the New York Insurance Law.

### COUNT II: VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENT FREEDOM OF SPEECH AND 42 U.S.C. § 1983 (DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF)

60.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 51 as if fully set forth herein.

61.     The Department's *de facto* prohibition on the marketing from or into New York of insurance products regulated by foreign insurance authorities and exclusively covering insureds located outside the State of New York and the United States is an unconstitutional abridgement of the freedom of speech protected by the First Amendment as applied to the States through the Due Process Clause of the Fourteenth Amendment.  The freedom of speech extends to commercial speech marketing or soliciting the purchase of goods or services.

62.     This prohibition is a content-based restriction of protected speech because it prohibits certain insurance companies from marketing insurance products for foreign insureds that are not subject to any legitimate regulation by the State of New York.

63.     This prohibition is a speaker-based restriction on speech because it targets one type of speaker—a company operating in New York that seeks *only* to market and solicit insurance products regulated by foreign insurance authorities and exclusively covering foreign insureds.

64.     GMD's marketing of ALICO's insurance products for foreign insureds was not false or misleading and concerned activity that is lawful in the foreign jurisdictions to which those products were subject.  There is no allegation to the contrary.

65.     The Department has no legitimate or important interest in prohibiting marketing and solicitation of foreign insurance products regulated by foreign insurance authorities and exclusively covering foreign insureds, as such activities affect neither the New York insurance market nor New York residents.   The insurance products, moreover, are already subject to regulation by foreign insurance regulators, with responsibility for and jurisdiction over the foreign insureds.

66.     The Department's interpretation of New York insurance laws to prohibit a company from marketing from or into New York insurance products regulated by foreign insurance authorities and exclusively covering foreign insureds does not directly advance any legitimate or important government purpose in regulating the New York insurance industry or protecting New York insureds.  Indeed, the Department has not identified (nor even alleged) a single harm to New York (or even foreign) insurance consumers, nor has the Department asserted that the conduct at issue somehow jeopardized or undermined the stability of New York's insurance market.  *See, e.g.*, Ex. A.  This lack of state interest is underscored by the fact that the Consent Order contains a detailed safe harbor provision apparently designed to allow ALICO to continue business operations without substantial interruption.  *Id.* at p. 11 ¶ 7.

67.     Any penalty imposed for these pure marketing activities, exclusive of any actual issuance or delivery of insurance in the State of New York, would deprive AIG of its "rights, privileges and immunities," 42 U.S.C. § 1983, under the Free Speech Clause of the First

Amendment, U.S. Const. amend I, as applied to the States through the Due Process Clause of the Fourteenth Amendment.

68.    An actual controversy exists between AIG and Defendant because Department officials, acting under color of law, have advised AIG that they will initiate administrative proceedings and other actions in order to impose a substantial monetary penalty on AIG for the purportedly illegal marketing activities which occurred in the State of New York prior to November 1, 2010.  The settlement and Consent Order between the Department and MetLife, announced on March 31, 2014, which expressly states the Department's conclusion that AIG has violated the New York Insurance Law, *see* Ex. A, at p. 9 ¶ 18, further corroborates the concrete and imminent likelihood of an enforcement action against AIG and the existence of an actual and ripe controversy.

69.    Plaintiff seeks a declaration that the State of New York may not, consistent with the First Amendment freedom of speech, prohibit a company operating in New York from marketing insurance products regulated by foreign insurance authorities and exclusively covering foreign insureds.

70.    Plaintiff further seeks an injunction prohibiting Defendant from commencing or continuing any proceeding (administrative or otherwise) or imposing any penalty (monetary or otherwise) against AIG due to the marketing, prior to November 1, 2010, of ALICO's insurance products regulated by foreign insurance authorities and exclusively covering foreign insureds.

**COUNT III: UNCONSTITUTIONAL BURDEN ON INTERSTATE
COMMERCE UNDER COMMERCE CLAUSE AND 42 U.S.C. § 1983
(DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF)**

71.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 51 as if fully set forth herein.

72.     ALICO and GMD engaged in out-of-state and foreign commerce by marketing insurance products that were regulated by foreign insurance authorities and covered foreign insureds.

73.     New York Insurance Law and related regulations, as interpreted by the Department, preclude a company operating in New York from marketing insurance products exclusively for foreign insureds without a New York insurance license but make such companies ineligible to obtain a license.

74.     The Department's refusal to license a company operating in New York and marketing foreign insurance contracts that are regulated by foreign insurance authorities and exclusively cover foreign insureds discriminates  against out-of-state commerce in violation of the dormant Commerce Clause, Art. I, section 8.   The Department has no legitimate or important interest, much less any compelling interest in doing so.   To date, the Department has not identified (nor alleged) any harm to a single New York insurance consumer, nor has the Department asserted that the conduct at issue jeopardized or undermined the stability of New York's insurance market.  *See, e.g.*, Ex. A.  Moreover, the Consent Order contains a detailed safe harbor provision apparently designed to allow ALICO to carry on its business without substantial interruption, notwithstanding the fact that it appears that ALICO cannot obtain a New York license.  *Id.* at p. 11 ¶ 7.  Thus, the Department's purported interest in prohibiting the activities in question is undermined by the terms of its own Consent Order.

75.     Alternatively, if New York permits a company operating in New York to market insurance contracts regulated by foreign insurance authorities and covering foreign insureds solely on condition that it also provide insurance to New York insureds so that it is then eligible for a New York insurance license, that state policy likewise discriminates facially against out-of-state commerce in violation the dormant Commerce Clause, Art. I, section 8.

76.     Defendant's impermissible discrimination against foreign commerce has deprived AIG of its "rights, privileges and immunities," 42 U.S.C. § 1983, under the Commerce Clause, U.S. Const. art. I, § 8.

77.     An actual controversy exists between AIG and Defendant concerning whether the dormant Commerce Clause permits the State of New York, through Defendant, to prohibit a company operating in the State of New York from marketing insurance products regulated by foreign insurance authorities and exclusively covering foreign insureds.  The settlement and Consent Order between the Department and MetLife, announced on March 31, 2014, which expressly states the Department's conclusion that AIG has violated the New York Insurance Law, *see* Ex. A, at p. 9 ¶ 18, further corroborates the concrete and imminent likelihood of an enforcement action against AIG and the existence of an actual and ripe controversy.

78.     Plaintiff seeks a declaration that the State of New York's interpretation and application of its insurance law violates the dormant Commerce Clause insofar as it either *de facto* prohibits a company marketing from or into New York insurance products regulated by foreign insurance authorities and exclusively covering foreign insureds or alternatively forces such a company, as a price of doing business in New York, to market to New York insureds so as to become eligible to obtain and so to obtain a New York insurance license.

79.     Plaintiffs further seek an injunction prohibiting Defendant from commencing or continuing any proceeding (administrative or otherwise) or imposing any penalty (monetary or otherwise) against AIG due to the marketing, prior to November 1, 2010, of ALICO's insurance products regulated by foreign insurance authorities and exclusively covering foreign insureds.

**PRAYER FOR RELIEF**

In light of the foregoing, Plaintiff respectfully prays that this Court:

A.     Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, that:

i.  Sections 1101(b)(1),1102(a), 2102(a) and 2117 of the New York Insurance Law are void  under the Due Process Clause of the Fourteenth Amendment as applied to the marketing from or into New York of insurance products regulated by foreign insurance authorities and exclusively covering insureds located outside the State of New York and the United States;

ii.  the State of New York's prohibition on the marketing from or into New York of insurance products regulated by foreign insurance authorities and exclusively covering insureds located outside the State of New York and the United States violates the Free Speech Clause of the First Amendment as applied to the States through the Due Process Clause of the Fourteenth Amendment; and

iii.  the State of New York violates the dormant Commerce Clause of Art. I, section 8 either by:  (a) prohibiting the marketing from or into New York of insurance products regulated by foreign insurance authorities and exclusively covering insureds located outside the State of New York, and/or (b) permitting such marketing activities from or into New York only on condition that they are coupled with the sale of insurance products to New York state residents that would make the insurer eligible to obtain a New York state insurance license.

B.      Issue a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, prohibiting Defendant from commencing or pursuing any proceeding (administrative or otherwise) or imposing any penalty (monetary or otherwise) against AIG due to the marketing, prior to November 1, 2010, of ALICO's insurance products regulated by foreign insurance authorities and exclusively covering insureds located outside the State of New York and the United States;

C.      Award reasonable attorneys' fees and costs;

D.      Award such other relief available under the law that may be considered appropriate under the circumstances, including other fees and costs of this action to the extent allowed by the law.

Dated:      New York, New York          QUINN EMANUEL URQUHART
            June 2, 2014                & SULLIVAN, LLP

                                        /s/ *Michael B. Carlinsky*
                                        Kathleen M. Sullivan
                                        Michael B. Carlinsky
                                        51 Madison Avenue, 22nd Floor
                                        New York, New York 10010
                                        Telephone: (212) 849-7000
                                        Facsimile: (212) 849-7100
                                        kathleensullivan@quinnemaunel.com
                                        michaelcarlinsky@quinnemaunel.com

                                        William A. Burck
                                        777 6th Street, 11th Floor
                                        Washington, D.C. 20001
                                        Telephone: (202) 538-8000
                                        Facsimile: (202) 538-8100
                                        williamburck@quinnemanuel.com

                                        *Attorneys for Plaintiff American International Group, Inc.*