**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AMERICAN INTERNATIONAL GROUP,
INC.,

                Plaintiff,

     v.

BENJAMIN M. LAWSKY, in his official
capacity as Superintendent of the New York
State Department of Financial Services,

             Defendant.

14-cv-2355 (AJN)

---

## <u>MEMORANDUM IN OPPOSITION TO<br>DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT</u>

Kathleen M. Sullivan
Michael B. Carlinsky
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
kathleensullivan@quinnemaunel.com
michaelcarlinsky@quinnemaunel.com

William A. Burck
Lori Alvino McGill
777 6th Street, 11th Floor
Washington, D.C. 20001
Telephone: (202) 538-8000
Facsimile: (202) 538-8000
williamburck@quinnemanuel.com
lorialvinomcgill@quinnemanuel.com

*Attorneys for Plaintiff American*
*International Group, Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    **A.**    ALICO's Activities ...............................................................................................3

    **B.**    The Statutory and Regulatory Scheme ...............................................................4

        1.    Section 1102:  Only Entities "Doing an Insurance Business" in New York Must Obtain a New York Insurance License ............................4

        2.    Sections 2117 and 2102(a):  "Insurance Producers" And Secondary Liability........................................................................................7

    **C.**    Defendant's Enforcement Activities....................................................................8

STANDARD OF REVIEW ....................................................................................................10

ARGUMENT .......................................................................................................................11

I.    THIS COURT HAS JURISDICTION ........................................................................11

    **A.**    AIG's Claims Are Constitutionally Ripe ...........................................................11

    **B.**    AIG Has Article III Standing .............................................................................12

        1.    AIG Has Established Injury In Fact ......................................................14

        2.    AIG's Claims Satisfy Causation and Redressability Requirements .........16

    **C.**    AIG's Claims Are Prudentially Ripe .................................................................17

    **D.**    Declaratory Judgment Would Provide "Conclusive" Relief ...............................20

II.    ABSTENTION IS NEITHER COMPELLED NOR APPROPRIATE ...........................22

    **A.**    *Younger* Is Not Applicable Because There Is No Ongoing State Proceeding...........................................................................................................23

    **B.**    *Burford* Abstention Is Inappropriate Because There Is No Risk Of Interfering With A Complex Administrative Scheme .............................................29

      **C.**    Discretionary *Pullman* Abstention Is Inappropriate Where The State's Conduct Is Chilling Commercial Speech Safeguarded By The First Amendment ............................................................................................. 32

III.    THE AMENDED COMPLAINT STATES SERIOUS CONSTITUTIONAL CLAIMS WITH MORE THAN ADEQUATE PARTICULARITY TO SURVIVE DISMISSAL ........................................................................................... 34

      **A.**    AIG's Amended Complaint States A Claim That DFS's Interpretation And Enforcement Of The New York Insurance Law Violates The Dormant Commerce Clause ................................................................................ 34

            1.    The McCarran-Ferguson Act Does Not Immunize DFS's Conduct, For It Is Limited To Authorizing A State's Regulation Of Its Own Insurance Markets ................................................................... 35

            2.    The McCarran-Ferguson Act Does Not Authorize A State To Regulate Foreign Insurance Activities ........................................ 35

            3.    DFS's Interpretation Of The New York Insurance Law Would Improperly Result In New York's Regulation Of Insurance Activities Occurring Entirely Outside Its Borders ..................... 36

      **B.**    AIG's Amended Complaint States A Claim For Violation Of Due Process ........ 38

      **C.**    AIG's Amended Complaint States A Claim For Violation Of The First Amendment Protection Of Commercial Speech ..................................... 41

**CONCLUSION** ........................................................................................ 44

# TABLE OF AUTHORITIES

**Page**

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)...............................................................................42, 43

*ACLU of Ill. v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ...........................................................27

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
  163 F.3d 780 (3d. Cir. 1999).............................................................34, 35

*Abbot Labs. v. Gardner*,
  387 U.S. 148 (1967)..........................................................................18

*Allen v. Wright*,
  468 U.S. 737 (1984)..........................................................................16

*Alliance of American Insurers v. Cuomo*
  854 F.2d 591 (2d Cir. 1988)..............................................................30, 31

*Allstate Ins. Co. v. Sabbagh*,
  603 F.2d 228 (1st Cir. 1979).............................................................31

*Alvarez v. City of New York*,
  2 F. Supp. 2d 509 (S.D.N.Y. 1998) ..................................................25

*Am. Ins. Assoc. v. Garamendi*,
  539 U.S. 396 (2003)..........................................................................38

*Am. Paper Ins. v. EPA*,
  996 F.2d 346 (D.C. Cir. 1993)...........................................................13

*Am. Petroleum Ins. v. EPA*,
  906 F.2d 729 (D.C. Cir. 1990)...........................................................13, 22

*Artway v. Attorney Gen. of State of N.J.*,
  81 F.3d 1235 (3d Cir. 1996)..............................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................10, 34, 41

*Aurelius Capital Master, Inc. v. MBIA Ins. Corp.*,
  695 F. Supp. 2d 68 (S.D.N.Y. 2010)..................................................30

*Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth*,
  134 F.3d 87, 93–94 (2d Cir. 1998)....................................................33, 34

*Baker v. Carr*,
  369 U.S. 186 (1962)..........................................................................14

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)...................................................................................10, 34

*Bronx Household of Faith v. Bd. of Educ.,*
    492 F.3d 89 (2d Cir. 2007)....................................................................13

*Burford v. Sun Oil,*
    319 U.S. 315 (1943).................................................................23, 29, 30, 31, 32

*CSI Aviation Servs., Inc. v. Dep't of Transp.,*
    637 F.3d 408 (D.C. Cir. 2011)..............................................................22

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of NY,*
    447 U.S. 557 (1980)..................................................................42, 43, 44

*City News & Novelty v. City of Waukesha,*
    531 U.S. 278 (2001)..................................................................22

*Connally v. General Constr. Co.,*
    269 U.S. 385 (1926)..................................................................38

*Cuomo v. Dreamland Amusements, Inc.,*
    2008 WL 4369270 (S.D.N.Y. Sept. 22, 2008)..............................26

*Clapper v. Amnesty Int'l,*
    133 S. Ct. 1138 (2013)..........................................................14, 15, 16

*Calderon v. Ashmus,*
    523 U.S. 740 (1998)..................................................................21, 22

*Dittmer v. Cnty. of Suffolk,*
    146 F.3d 113 (2d Cir. 1998)..................................................................29

*Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.,*
    411 F.3d 384 (2d Cir. 2005)..................................................................20

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin,*
    733 F.3d 393 (2d Cir. 2013)..................................................................14, 15

*F.C.C. v. Fox Television Stations, Inc.,*
    132 S. Ct. 2307 (2012)..............................................................15, 38, 40, 41

*F.T.C. v. Travelers Health Ass'n,*
    362 U.S. 293 (1960)..................................................................35

*F.T.C. v. Nat'l Cas. Co.,*
    357 U.S. 560 (1958)..................................................................36

*Freedom Holdings Inc. v. Spitzer,*
    357 F.3d 205 (2d Cir. 2004)..................................................................38

*Frisone v. Pepsico, Inc.,*
    369 F. Supp. 2d 464 (S.D.N.Y. 2005)....................................................10

*Fund v. City of New York*,
   2014 WL 2048204 (S.D.N.Y. May 19, 2014) ................................................27

*GTE Spacenet Corp. v. N.Y. State Dep't of Taxation & Fin.*,
   201 A.D.2d 429 (N.Y. App. Div. 1st Dep't 1994) ..........................................32

*Gerling Global Reinsurance Corp. of Am. v. Low*,
   240 F.3d 739 (9th Cir. 2001) .......................................................................37

*Gibson v. Berryhill*,
   411 U.S. 564 (1973) ...............................................................................28, 29

*Gov't Emps. Ins. Co v. Saco*,
   2014 WL 639419 (E.D.N.Y. Feb. 18, 2014) ..................................................11

*Greenery Rehabilitation Group Inc. v. Sabol*,
   841 F. Supp. 58 (S.D.N.Y. 1993) ..................................................................10

*Guillemard-Ginorio v. Contreras-Gomez*,
   585 F.3d 508 (1st Cir. 2009) ............................................................23, 24, 25

*Gully v. Nat'l Credit Union Admin. Bd.*,
   341 F.3d 155 (2d. Cir. 2003) ........................................................................15

*Hachamovitch v. DeBuono*,
   159 F.3d 687 (2d Cir. 1998) ...................................................................30, 31

*Harris v. Mills*,
   572 F.3d 66 (2d. Cir. 2009) ...................................................................10, 41

*Hip-Hop Summit Action Network v. New York Temporary State Commission on Lobbying*,
   2003 WL 22832569 (S.D.N.Y. Nov. 25, 2003) ..............................................26

*Huffman v. Pursue, Ltd.*,
   420 U.S. 592 (1975) .....................................................................................26

*IMS Health Inc. v. Sorrell*,
   630 F.3d 263 (2d Cir. 2010) .........................................................................44

*J. & W. Seligman & Co. v. Spitzer*,
   2007 WL 2822208 (S.D.N.Y. Sept. 27, 2007) ...............................................26

*Jacoby & Meyers, LLP v. Presiding Justices of the App. Div.*,
   488 Fed. App'x 526 (2d Cir. Nov. 21, 2012) ..........................................17, 33

*Johnson v. Nyack Hosp.*,
   964 F.2d 116 (2d Cir. 1992) .........................................................................32

*Larson v. Valente*,
   456 U.S. 228 (1982) .....................................................................................17

*Law Enforcement Ins. Co. v. Corcoran*,
   807 F.2d 38 (2d Cir. 1986) ...........................................................................30

*Levy v. Lewis,*
  635 F.2d 960 (2d Cir. 1980) ................................................................................30

*Lighthouse Pointe Prop. Assocs. v. N.Y. State Dep't of Envtl. Conservation,*
  14 N.Y.3d 161 (2010) ........................................................................................41

*Makarova v. United States,*
  201 F.3d 110 (2d Cir. 2000) ...............................................................................10

*McBryde v. Committee to Review Circuit Council Conduct and Disability Orders of Judicial Conference of the United States,*
  264 F.3d 52 (D.C. Cir. 2001) .............................................................................15

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
  457 U.S. 423 (1982) ...........................................................................................25

*Mir v. Shah*
  2012 WL 6097770 (S.D.N.Y. Dec. 4, 2012) ......................................................26

*Monsanto Co. v. Geertson Seed Farms,*
  130 S. Ct. 2743 (2010) .......................................................................................14

*Moore v. Sims,*
  442 U.S. 415 (1979) ...........................................................................................26

*Mullholland v. Marion,*
  746 F.3d 811 (7th Cir. 2014) ..............................................................................27

*N.Y. Times Co. v. Gonzales,*
  459 F.3d 160 (2d Cir. 2006) ...............................................................................21

*In re National Century Fin. Enters., Inc., Inv. Lit.,*
  755 F. Supp. 2d 857 (S.D. Ohio 2010) ..............................................................35

*Natural Res. Def. Council v. Johnson,*
  461 F.3d 164 (2d Cir. 2006) ...............................................................................10

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans [NOPSI],*
  491 U.S. 350 (1989) ...........................................................22, 23, 26, 27, 29, 31

*O'Keefe v. Schmitz,*
  2014 WL 1379934 (E.D. Wisc. Apr. 18, 2014) ..................................................27

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998) ...........................................................................................18

*Palazzolo v. Rhode Island,*
  533 U.S. 606 (2001) ...........................................................................................19

*Papachristou v. Jacksonville,*
  405 U.S. 156 (1972) ...........................................................................................38

*Public Serv. Comm'n v. Wycoff,*
  344 U.S. 237 (1952) ...........................................................................................21

*Quackenbush v. Allstate Ins. Co.*,
  517 U.S. 706 (1996) ..................................................................29

*Quill v. Vacco*,
  80 F.3d 716 (2d Cir. 1996) .......................................................11

*R.R. Comm'n of Texas v. Pullman*,
  312 U.S. 496 (1941) .......................................................23, 32, 33

*Regional Rail Reorganization Act Cases*,
  419 U.S. 102 (1974) ..................................................................19

*Reno v. Am. Civil Liberties Union*,
  521 U.S. 844 (1997) ..................................................................40

*Riva v. Mass.*,
  61 F.3d 1003 (1st Cir. 1995) .....................................................13

*Robertson v. Cal.*,
  328 U.S. 440 (1946) ..................................................................37

*Roman Catholic Archdiocese of N.Y. v. Sebelius*,
  907 F. Supp. 2d 310 (E.D.N.Y. 2012) ................................13, 22

*Ross v. Bank of Am., N.A.*,
  524 F.3d 217 (2d Cir. 2008) .....................................................14

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*,
  748 F.2d 774 (2d Cir. 1984) .....................................................10

*S.E.C. v. Nat'l Secs., Inc.*,
  393 U.S. 453 (1969) ..................................................................36

*Samuels v. Mackell*,
  401 U.S. 66 (1971) ....................................................................25

*Schiavone Constr. Co. v. N.Y. City Transit Auth.*,
  593 F. Supp. 1257 (S.D.N.Y. 1984) .....................................24, 25

*Sokolowsky v. Metro. Transp. Auth.*,
  723 F.3d 187 (2d Cir. 2013) .....................................................10

*Sprint Comm'ns, Inc. v. Jacobs*,
  134 S. Ct. 584 (2013) ...................................................22, 23, 26, 27

*SR Int'l Bus. Ins. Co. v. Allianz Ins. Co.*,
  343 Fed. App'x 629 (2d Cir. 2009) ...........................................20

*State Farm Mut. Auto. Ins. Co. v. Mallela*,
  175 F. Supp. 2d 401 (E.D.N.Y. 2001) ......................................41

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ..................................................................11

*Susan B. Anthony List v. Driehaus,*
  573 U.S. _ (2014) ...............................................................................11, 13, 16, 18, 20

*Telco Commc'ns, Inc. v. Carbaugh*
  885 F.2d 1225 (4th Cir. 1989) ....................................................................24, 25, 27

*Thompson v. W. States Med. Ctr.,*
  535 U.S. 357 (2002) ..............................................................................................41

*Trainor v. Hernandez,*
  431 U.S. 434 (1977) ..............................................................................................26

*U.S. Dep't of Treas. v. Off. Comm. Of Unsec. Creditors of Motors Liq. Co.,*
  475 B.R. 347 (S.D.N.Y. 2012) ..............................................................................11

*United Services Auto. Ass'n v. Muir,*
  792 F.2d 356 (3d Cir. 1986) ..................................................................................30

*United States v. Caronia,*
  703 F.3d 149 (2d Cir. 2012) ..................................................................................43

*United States v. Fell,*
  360 F.3d 135 (2d Cir. 2004) ..................................................................................11

*United States v. Olivencia,*
  689 F. Supp. 1319 (S.D.N.Y. 1988) ......................................................................20

*United States v. South Carolina,*
  720 F.3d 518 (4th Cir. 2013) ................................................................................27

*United States v. South-Eastern Underwriters Ass'n,*
  332 U.S. 533 (1944) ..............................................................................................35

*United States v. Williams,*
  553 U.S. 285 (2008) ..............................................................................................40

*Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976) ..............................................................................................41

*Vt. Right to Life Comm. Inc. v. Sorrell,*
  221 F.3d 376 (2d Cir. 2000) ......................................................................32, 33, 34

*W. & S. Life Ins. Co.,*
  451 U.S. 648 (1981) ........................................................................................36, 37

*Walker v. Flitton,*
  364 F. Supp. 2d 503 (M.D. Pa. 2005) ..................................................................43

*Watergate II Apartments v. Buffalo Sewer Auth.,*
  46 N.Y.2d 52 (1978) ..............................................................................................32

*Wickes v. Ward,*
  1988 WL 5384 (S.D.N.Y. Jan. 13, 1988) ............................................................28

*Williams v. Casey*,
   657 F. Supp. 921 (S.D.N.Y. 1987) ...............................................................10

*Younger v. Harris*,
   401 U.S. 37 (1971)...............................................................23, 24, 25, 26, 27, 29

*Zablocki v. Redhail*,
   434 U.S. 374 (1978)....................................................................................31

## **Statutes and Rules**

Federal Rule of Civil Procedure 12 .................................................................2, 10

15 U.S.C. §§ 1011–1015 ..............................................................................35

1993 N.Y. Sess. Laws ch. 663 (McKinney) ...........................................................5

N.Y. A.P.A. § 102 .....................................................................................27

N.Y. Ins. Law § 1101 ............................................................................ passim

N.Y. Ins. Law § 1102 ............................................................................ passim

N.Y. Ins. Law § 1104 ...................................................................................8

N.Y. Ins. Law § 1106 ..................................................................................37

N.Y. Ins. Law § 1413 ...................................................................................6

N.Y. Ins. Law § 2101 ...................................................................................7

N.Y. Ins. Law § 2102 ............................................................................ passim

N.Y. Ins. Law § 2117 ............................................................................ passim

N.Y. Ins. Law § 4217 ..................................................................................37

N.Y. Ins. Law § 4205 ..................................................................................37

## **Other Authorities**

Brief of United States of America as *Amicus Curiae, Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396
   (2003)....................................................................................................39

Federal Practice and Procedure § 2757 (3d ed.) ....................................................16

H.R. Rep. No. 143, 79th Cong., 1st Sess. 3.).......................................................35

Jorden Burt, *Considerations for Insurers in the Aftermath of the MetLife Consent Decree*,
   CARLTON FIELDS BULLETIN (Apr. 17, 2014), .......................................................34

Plaintiff American International Group ("AIG" or "Plaintiff") respectfully submits this memorandum of law in opposition to Defendant Benjamin M. Lawsky's ("Superintendent Lawsky," "Defendant," the "Department," or "DFS") Motion to Dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

Superintendent Lawsky's motion to dismiss is written as if DFS is acting on a clean slate, has just begun its investigation of AIG and has no idea whether it will initiate formal proceedings against AIG or, if so, what the charged violations will be. But the Consent Order that DFS negotiated, drafted, and signed on March 31, 2014 with MetLife contradicts any such suggestion. In express language that the motion remarkably omits to mention, the Consent Order makes clear that DFS has already conducted an extensive factual investigation and that "DFS finds the foregoing acts and practices of MetLife, *AIG*, ALICO and DelAm *violate* N.Y. Ins. Law §§ 1102, 2102(a) and 2117." *See* Am. Compl., Ex. A, at 9 ¶ 18 (emphases added) [hereinafter "Consent Order"].

These findings and conclusions against AIG in the Consent Order plainly establish AIG's Article III standing and render each of Defendant's authorities on standing and ripeness inapposite. The Superintendent's arguments that the Court should dismiss the Amended Complaint on prudential ripeness or other discretionary grounds are equally unpersuasive. In its motion to dismiss the original complaint, DFS argued that Sections 2117 and 2102(a) were potentially applicable and not specifically addressed by the original complaint, and that therefore the complaint should be dismissed. Now that the Amended Complaint specifically addresses those provisions, DFS has shifted gears to focus on inapplicable provisions of New York's Insurance Holding Company Act. But the Amended Complaint does not seek relief regarding those statutes; it seeks relief regarding the provisions that DFS has already concluded AIG violated. Because AIG's claims present purely legal issues based on a factual record the completeness of which DFS only nominally disputes, this case is both constitutionally and prudentially ripe for resolution.

DFS's effort to evade review of the federal questions presented here on abstention grounds is likewise misguided. AIG's Amended Complaint seeks a declaration that DFS's interpretation and enforcement of the New York Insurance law as articulated in the Consent Order is unconstitutional.

Abstention doctrines do not prohibit a federal court from hearing constitutional challenges to a State's conduct that has (as here) already occurred, and which will continue to occur, simply because the State says that it may, at some undetermined time in the future, decide to change course and initiate state proceedings that conform to constitutional requirements. As Defendant recognizes, abstention serves the interests of comity and federalism by preventing federal courts from "premature[ly] interven[ing] in state proceedings that would increase friction between the state and federal systems, and encroach unnecessarily on an area of policy assigned to the state." Motion at 13–14. But this action does not interfere with any ongoing development and articulation of insurance law and policy, both because DFS has already articulated its unconstitutional interpretation and policy in the Consent Order, and because it has not initiated formal proceedings against AIG, so there are no ongoing state proceedings in favor of which this Court may abstain.

As set forth in AIG's Amended Complaint, AIG brings constitutional claims based on the dormant Commerce Clause, the due process requirement of fair notice, and the First Amendment protection of truthful commercial speech. Those claims clearly satisfy requisite pleading standards, and the merits of the claims must await a later stage of this litigation. In any event, the Superintendent's merits arguments are unpersuasive, as AIG's claims are viable and compelling.

This memorandum will first set forth the relevant factual and procedural background, followed by a discussion of the facts and authorities demonstrating that AIG has standing to pursue its claims. Next, the memorandum addresses Superintendent Lawsky's arguments regarding abstention and why none of the doctrines is applicable here. Finally, it shows that Superintendent Lawsky's Rule 12(b)(6) arguments inappropriately contradict AIG's Amended Complaint and are unpersuasive in any event. Superintendant Lawsky's motion should be denied in its entirety.

## STATEMENT OF FACTS

ALICO was incorporated under the laws of the State of Delaware on August 18, 1921 as the Asia Life Insurance Company, with its principal office located in Shanghai, China. In 1951, ALICO amended its Certificate of Incorporation to change the corporate title to American Life Insurance Company and to change the principal office to Bermuda. In 1969, ALICO again relocated its

principal office, this time to Wilmington, Delaware.  Am. Compl. ¶¶ 29–30.  ALICO was a wholly-owned subsidiary of AIG until it was sold to MetLife on November 1, 2010.  *Id.* ¶ 10.

### A.     ALICO's Activities

During the time that it was owned by AIG, ALICO, through its branches and subsidiaries in more than 50 countries, underwrote, issued, and delivered a range of life and health insurance products, including traditional life, variable life, annuities, pensions, personal accident insurance, and group insurance for large and small organizations.  ALICO's life insurance products were marketed non-exclusively by the Group Management Division ("GMD"), which described itself as marketing products and services of group life insurance companies, including ALICO, throughout the world.  *Id.* ¶ 31.  Much of the marketing of ALICO's insurance products occurred in New York, and most senior GMD employees were based in New York and Delaware.  *Id.* ¶ 32.

Marketing by GMD personnel typically included presentations to and discussions with multinational clients by phone, email, and in person, in an effort to assess their needs for foreign products in foreign operations and to discuss ALICO's capabilities regarding those foreign products and operations.  Such calls, emails, and meetings typically were initiated either by existing or potential clients or by GMD personnel.  GMD personnel would contact U.S.-based multinational corporations that had foreign operations in countries where ALICO could provide group employee benefit packages or pension products.  *Id.* ¶ 33.

If the corporation was interested in an employee benefits package for one or more of its foreign operations, GMD personnel in the U.S. would provide information to the U.S. contact in that corporation regarding ALICO subsidiaries, and at times, specific ALICO insurance products, in the relevant countries.  *Id.* ¶ 34.  GMD personnel also would either refer the lead to GMD counterparts in its local (foreign) offices who would follow up by contacting the local (foreign) operation of the U.S.-based corporation, or provide a proposal from a local (foreign) insurer directly to the U.S. contact.  If the transaction was consummated between the foreign office and the non-U.S. ALICO branch or subsidiary, the policy would be underwritten, issued, and delivered, and the premium

would be received, in that foreign jurisdiction by the ALICO licensed insurance entity, and would be subject to regulation by the insurance authorities in that foreign jurisdiction. *Id.*

With respect to ALICO's insurance products prior to November 1, 2010, all key aspects of insurance policy issuance and delivery—underwriting, contracting, and premium collection—occurred outside of New York. *Id.* ¶ 35.  At no time prior to November 1, 2010, was the marketing, solicitation, or sale of insurance products to New York insureds part of ALICO's business or GMD's marketing of ALICO's insurance products. *Id.* ¶ 36.  Nor at any time prior to November 1, 2010, did ALICO or GMD maintain any premiums for insurance in the State of New York. *Id.*

**B.     The Statutory and Regulatory Scheme**

**1.     Section 1102:  Only Entities "Doing an Insurance Business" in New York Must Obtain a New York Insurance License**

During the decades in which ALICO's foreign insurance products were marketed to multinational corporations to cover their overseas employees, ALICO did not seek or obtain an insurance license since New York Insurance Law, on its face, does not require a license to market insurance products exclusively covering out-of-state (in fact, out-of-country) employees of multinational companies. *Id.* ¶¶ 37–38.

Specifically, Section 1102 of the New York Insurance Law provides that "[n]o person, firm, association, corporation, or joint-stock company shall *do an insurance business in this state* unless authorized by a license in force pursuant to the provisions of this chapter, or exempted by the provisions of this chapter from such requirement."  N.Y. Ins. Law § 1102(a) (emphasis added). Section 1101(b) of the statute defines "doing an insurance business" as follows:

> [A]ny of the following acts *in this state*, effected by mail from outside this state or otherwise, by any person, firm, association, corporation or joint-stock company shall constitute *doing an insurance business* in this state and shall constitute doing business in the state within the meaning of section three hundred two of the civil practice law and rules:
>
> (A) making, or proposing to make, as insurer, any insurance contract, *including either* issuance or delivery of a policy or contract of insurance to *a resident of this state* or to any firm, association, or corporation authorized to do business herein, *or solicitation of applications* for any *such* policies or contracts;

N.Y. Ins. Law § 1101(b)(1)(A) (emphases added).[1]  These statutes are clear that "doing an insurance business in this state" (and thus the New York licensing requirement) is limited to activities relating to insurance contracts *made in New York* or with *New York insureds*, and does not extend to contracts made outside of New York with non-New York insureds.

Indeed, the legislative history of the statute confirms that the licensing regime was designed to protect *New York* consumers from unscrupulous insurance companies selling fraudulent or unregulated products.  *See* Mem. from Richard E. Stewart, Superintendent of Ins., to Gov. of N.Y. (May 1, 1970) ("The 1969 bill was similar to the current bill in its intent *to protect residents of this state* from mail solicitations from unauthorized insurers whose responsibility and soundness is questionable….  The bill's salutary effect is to require foreign insurers to qualify under our laws before they may *solicit our residents*") (emphases added); N.Y. Bill Jacket, 1970 A. 3786, ch. 295 (Gov.'s Mem.) ("The purpose of the bill is to protect *residents of this state* from solicitation by mail by insurance companies which may be financially unsound or irresponsible.") (emphasis added); *see also* 1993 N.Y. Sess. Laws ch. 663 (McKinney) ("The legislature hereby finds and declares that a principal goal of effective insurance regulation must be to allow *citizens of this state* reasonable access to financially sound and reliable insurers….") (emphasis added); Ins. Law Revision of the State of N.Y. (Tentative Draft) § 50.3 cmt., at 106 (1937) ("[T]he chief concern of the State of New York is the regulation of insurance on property on risks within its borders.").

Notwithstanding the text and legislative history of the relevant statutory provisions, DFS has announced that ALICO's marketing (through GMD) of *foreign* life insurance products regulated by *foreign* insurance authorities and covering exclusively *foreign* insureds constitutes "doing an insurance business" under the New York Insurance Law.  Am. Compl. ¶¶ 40–42.  DFS used that new interpretation of the law to extract a hefty $50 million dollar settlement from MetLife—the current

---

[1]  Superintendent Lawsky's argument that Section 107(b) requires that the term "including" in Section 1101(b)(1)(A) "must not be read to exclude items not specifically enumerated," *see* Motion at 5 n.4, ignores that Section 107(b) expressly provides that such an interpretative rule is not applicable where "the context requires otherwise."  Such is the case here, where "including" is followed by "*either*" and the two alternative ways (issuance or delivery of a policy or contract of insurance to certain persons "*or*" solicitation of applications for such policies or contracts) that "doing an insurance business in this state" is defined under Section 1101(b)(1)(A).

owner of ALICO—and has announced its intention to impose massive fines on AIG for GMD's past marketing conduct, going back decades.  *Id*. ¶¶ 44–48.

DFS's new position that ALICO should have obtained a New York insurance license before GMD personnel engaged in any marketing activity concerning overseas employees is puzzling, since ALICO was not eligible for a New York insurance license absent sales of insurance to New York residents.  *Id*. ¶ 49.  New York's licensing process is governed by the Uniform Certificate of Authority Application ("UCAA"), which would have required ALICO to file a UCAA expansion application to obtain a license.  *Id*. ¶¶ 23–24.  For such an application to be accepted, ALICO would have been required to comply with several provisions, including the disclosure of information specific to the selling of insurance *to New York residents*.  Such information includes but is not limited to:

- Product lines currently sold or planned;
- Specialty line or lines currently sold and planned;
- Marketing plan (including how New York fits into ALICO's overall plan);
- Detailed description of planned advertising;
- Current and expected competition (both regionally and nationally);
- Plan of operations (including how policies are underwritten and cancelled; premiums handled; and personnel trained, supervised, and compensated);
- Three-year premium and loss projections for each line of business;
- Minimum capital and surplus requirements;
- Statutory deposit requirements.[2]

Since ALICO did not write insurance for New York insureds, ALICO could not provide most of the information required to obtain a New York license and thus could not have expected to need such a license, nor been eligible for such a license according to the statutory and regulatory terms.

---

[2]   *See* Uniform Certificate of Authority Application Questionnaire, Nat'l Assoc. of Ins. Comm'rs, *available at* http://www.naic.org/documents/industry_ucaa_form08.doc (last visited May 19, 2014).  DFS suggests that the form's many provisions directed at the applicant's proposed New York insurance activities (which indicate that it has no application to ALICO) should be disregarded because ALICO could have answered the numerous provisions as "not applicable."  Motion at 41 n.25.  But DFS ignores that the form's focus on New York insurance activities, rates, and premiums is consistent with Section 1101(b)'s focus on New York residents and risks, and further demonstrates that a company like ALICO was not required to be licensed under New York law.  Under Defendant's theory, a high school student looking for a summer job should not feel disqualified from applying to a position as a nuclear engineer even though the application asks for college and graduate degrees, references, and prior work history because she could simply fill in those questions as "not applicable."

Am. Compl. ¶ 24.  Consistent with this, at the time ALICO was AIG's subsidiary, officials from DFS indicated that a company like ALICO was not eligible for a New York insurance license.  *Id*. ¶ 25.  Indeed, that the Consent Order permits ALICO to continue operating without a license strongly suggests that ALICO remains ineligible for a New York Insurance License.  *See id.*, Ex. B (Consent Order allows ALICO "through an authorized insurer, to continue activities in New York related to its global employee benefits business through June 30, 2015," and, in the meantime, ALICO "is seeking legislation to allow for such activities beyond that date.").

### 2. Sections 2117 and 2102(a):  "Insurance Producers" And Secondary Liability

Related to its interpretation and enforcement of Section 1102, DFS has also taken the position that AIG violated Sections 2117(a) and 2102(a).  Consent Order at 9, ¶ 18.  Section 2117(a) effectively prohibits the aiding and abetting of violations of Section 1102, by providing that:

> No person, firm, association or corporation shall in this state act as agent for any insurer or health maintenance organization which is not licensed or authorized to do an insurance or health maintenance organization business in this state, in the doing of any insurance or health maintenance organization business in this state or in soliciting, negotiating or effectuating any insurance, health maintenance organization or annuity contract or shall in this state act as insurance broker in soliciting, negotiating or in any way effectuating any insurance, health maintenance organization or annuity contract of, or in placing risks with, any such insurer or health maintenance organization, or shall in this state in any way or manner aid any such insurer or health maintenance organization in effecting any insurance, health maintenance organization or annuity contract.

Section 2102(a), in turn, provides that "no person, firm, association or corporation shall act as an insurance producer … without having authority to do so by virtue of a license issued and in force pursuant to the provisions of this chapter."  An "insurance producer" is defined as an "insurance agent, insurance broker … or any other person required to be licensed under the laws of this state to sell, solicit, or negotiate insurance," N.Y. Ins. Law § 2101(k)(1), and an "insurance agent" is "any authorized or acknowledged agent of an insurer … who acts as such in solicitation of, negotiation for, or sale of, an insurance … contract, other than as a licensed insurance broker," *id.* § 2101(a).

In the context of New York's overall insurance regulatory and statutory framework, it is plain that Sections 2117 and 2102 are designed to protect New York consumers from certain conduct by

(i) unlicensed individuals and (ii) individuals on behalf of unlicensed insurers.  Indeed, much as for Sections 1102 and 1101, the legislative history supports reading Section 2117 to apply only to insurance activities targeted at New York, as opposed to foreign, residents.  Specifically, the legislative history to an amendment of Section 2117's predecessor provides:

> [The predecessor to Section 2117] has accomplished a *great deal by protecting the citizens of this state*. …[I]t is, therefore, important that persons and corporations in this state should be prohibited from acting here as agents of such foreign nonadmitted insurers, whether incorporated or unincorporated, *so that our citizens will not be encouraged to obtain insurance from such insurers*....  I will be able, I believe, to prevent [unauthorized, unincorporated foreign insurers] from continuing their activities with a resultant benefit to the citizens of this state.

Letter from Francis R. Stoddard, Jr., Superintendent of Ins., to James A. Parsons, Counsel to Gov., (Mar. 12, 1923), N.Y. Bill Jacket 1923, ch. 43 (also noting that the predecessor provision was intended to protect New York domestic insurers from competition) (emphases added).  Superintendent Lawsky himself concedes that the purpose of New York's insurance regulatory regime is decidedly local in nature, describing it as "intended to promote the soundness and integrity of *its* insurance markets for the benefit of the *State's* economy as a whole, and to ensure that insurers, producers, and other entities *participating in New York's insurance markets* conform to standards of financial soundness, responsibility, and honesty."  Motion at 6 (citing, *inter alia*, "§ 1104 (permitting Superintendent to revoke a foreign or alien insurer's license if … the Superintendent finds that … 'revocation is reasonably necessary to *protect the interest of the people of this state*')") (emphases added).

## C.    Defendant's Enforcement Activities

Superintendent Lawsky's efforts to impose upon AIG DFS's unprecedented reading of the Insurance Law as applicable to foreign insurance contracts began in approximately February 2013—more than three years after AIG had sold ALICO to MetLife—when DFS notified AIG that it was investigating whether the marketing of ALICO's foreign insurance products to multinational corporations from offices in New York constituted "doing an insurance business" without a license, *see* Am. Compl. ¶ 41, and requested (and received) many documents concerning the issue from AIG

on a voluntary basis.[3]  On June 7, 2013, DFS told AIG that it had summarily concluded that GMD's marketing of ALICO's insurance products in New York constituted unlicensed insurance business. DFS asserted that, since the alleged violations date back several decades, AIG's and ALICO's potential civil penalty exposure under Insurance Law Section 1102 is very substantial.  *Id.* ¶¶ 40–42.

DFS gave AIG a settlement proposal on October 21, 2013 to resolve its investigation into ALICO's activities.  At that time, DFS threatened that, if AIG refused to resolve the case, DFS would initiate formal enforcement proceedings against AIG.  *Id*. ¶ 43.  On March 31, 2014, Defendant Lawsky announced in a press release that MetLife had agreed to pay $50 million to settle DFS's investigation into ALICO's activities as to MetLife.  *Id*. ¶ 44.  The consent order that memorializes that agreement ("Consent Order"), discussed in more detail below, contains a detailed "Factual Background" setting forth various "findings" and "conclusions" that identify AIG by name. The Consent Order concludes as follows:

> 17.    AIG, ALICO, DelAm and MetLife insurance activities went well beyond engaging in 'back office' functions. In fact, ALICO, *AIG*, DelAm and MetLife were soliciting insurance business in New York without a license.
>
> 18.    DFS *finds the foregoing acts and practices* of MetLife, *AIG*, ALICO and DelAm *violate* N.Y. Ins. Law §§ 1102, 2102(a) and 2117.

*Id*., Ex. A, Consent Order at 9, ¶¶ 17–18 (emphases added).  Thus, even though AIG is not a party to the Consent Order and was not represented in the negotiation of its terms, DFS nevertheless has publicly announced both its current interpretation of the relevant provisions of New York Insurance Law and its finding that AIG violated Sections 1102, 2102(a), and 2117.

On April 1, 2014 (the day after announcing the terms of the Consent Order) DFS served broad and sweeping subpoenas *duces tecum* and *ad testificandum* on AIG seeking information about ALICO and its activities prior to the sale to MetLife (that were largely duplicative of previous requests).  AIG tendered an initial production of responsive documents on April 8 (pursuant to the one-week return date in the subpoena) and is continuing to review and produce responsive

---

[3]  *See* AIG, Annual Report at 295 (Form 10-K) (Feb. 14, 2014).  According to the Mulvihill Declaration, the investigation began well before February 2013, in 2011.  *See* Mulvhill Decl. ¶ 19.

documents.  On June 13, 2014, AIG produced a senior-level corporate designee for a deposition before the Department to testify in response to the subpoena *ad testificandum*.  AIG has received no notice of hearing or other indication that DFS has initiated the threatened formal enforcement proceeding, and DFS has asserted that "there are no current enforcement charges against AIG" and does not expect any "for some time."  Motion at 12, 29.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss must be denied unless a plaintiff fails to allege sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984).  The factual allegations of the complaint need only be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  On a motion to dismiss, the court must "accept as true all of the allegations contained in the complaint." *Harris v. Mills*, 572 F.3d 66, 71–72 (2d. Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

Likewise, when considering a motion to dismiss for lack of subject matter jurisdiction, the "court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).  Dismissal is proper under Rule 12(b)(1) only where the "district court lacks the statutory or constitutional power to adjudicate a case." *Sokolowsky v. Metro. Transp. Auth.*, 723 F.3d 187, 190 (2d Cir. 2013) (quotations and citations omitted).  Under Rule 12(b)(1), the court may refer to evidence beyond the pleadings to resolve disputed jurisdictional facts, *see Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), and therefore may consider "affidavits or other evidence," *Frisone v. Pepsico, Inc.*, 369 F. Supp. 2d 464, 469 (S.D.N.Y. 2005).[4]

---

[4]  Prior to a dismissal of a complaint on subject matter grounds, the non-moving party must be provided an opportunity to take jurisdictional discovery.  *See, e.g., Greenery Rehab. Grp. Inc. v. Sabol*, 841 F. Supp. 58, 62 (S.D.N.Y. 1993) (Without providing non-moving party the opportunity for discovery, "it would be wholly inappropriate for this Court to determine the issue of subject matter jurisdiction."); *Williams v. Casey*, 657 F. Supp. (footnote continued)

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION

### A.    AIG's Claims Are Constitutionally Ripe

"At the core of the ripeness doctrine is the necessity of ensuring that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III." *United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004) (quotations omitted). The "touchstone for whether a controversy is ripe for resolution by declaratory judgment—or whether it is sufficiently real and immediate—is whether the relief sought 'relates to dispute where the alleged liability has accrued or the threatened risk occurred, or rather whether the feared legal consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass.'" *Gov't Emps. Ins. Co v. Saco*, 2014 WL 639419, at *4 (E.D.N.Y. Feb. 18, 2014) (quoting *U.S. Dep't of Treas. v. Off. Comm. Of Unsec. Creditors of Motors Liq. Co.*, 475 B.R. 347, 359 (S.D.N.Y. 2012)).

Where the alleged violations of a challenged law have already occurred, as here, and there is a genuine threat of future enforcement proceedings, the case is ripe for review. *See, e.g.*, *Quill v. Vacco*, 80 F.3d 716, 723 (2d Cir. 1996) (challenge to statute was ripe for review where one of the physician plaintiffs "has had a criminal proceeding instituted against him in the past, and the state nowhere disclaims an intent to repeat a prosecution in the event of further assisted suicides"), *judgment rev'd on other grounds*, 521 U.S. 793 (1997); *Vt. Right to Life Comm. Inc. v. Sorrell*, 221 F.3d 376, 382–84 (2d Cir. 2000) (case is ripe where, under a "reasonable enough" construction of statute, plaintiff "may legitimately fear that it will face enforcement of the statute by the State" and "will be subjected to penalties for its planned [and past] expressive activities"); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. _, _ (2014) (slip op., at 8) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or* there is a '*substantial risk*' that that the harm will occur" (citation omitted) (emphases added)); *Steffel v. Thompson*, 415 U.S. 452, 459

---

921, 925 (S.D.N.Y. 1987) ("Dismissal [under Rule 12(b)(1)] without allowing plaintiff any opportunity to conduct reasonable discovery has been held to be an abuse of discretion.").

(1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute he claims deters the exercise of his constitutional rights.").

These authorities establish that AIG's claims are ripe, where DFS has threatened future enforcement proceedings and *has already* (i) publicly announced that it completed its investigation, *and* (ii) based on that investigation concluded that AIG violated the law, *and* (iii) extracted a $50 million dollar penalty from MetLife for the very same activities and violations of law that DFS found AIG to have committed and continues to pursue.

Defendant's ripeness argument is most remarkable for what it fails to acknowledge.  Not once does the Motion mention that DFS already concluded in the Consent Order that *AIG* violated the law—the very finding that precipitated the filing of this action.  *See, e.g.*, Am. Compl. ¶¶ 44–49 ("[B]y the plain terms of the Consent Order, DFS has already concluded that AIG has violated the law; the only remaining question is *when* DFS will initiate enforcement proceedings against AIG.").

Instead, Defendant seeks to persuade this Court that DFS's investigation of AIG is in its infancy, that this action is premature, and that the relief AIG seeks amounts to an "advisory" opinion because "it remains to be seen what statutory violations, if any, would be charged against AIG, and on what factual grounds."  *See* Motion at 2–3, 11–12, 24–25, 25–31.  But DFS told the world quite the opposite in the Consent Order and related press release.  *See* Consent Order; Am. Compl. ¶ 44. The Consent Order itself reveals that DFS's "investigation"—at least as it pertains to the conduct and provisions that are the subject of this lawsuit—is a *fait accompli*.  Thus, while DFS now asserts that, "[i]n its *ongoing investigation* of AIG, DFS is *examining* whether, and to what extent, New York law prohibits AIG's in-state activities," Motion at 12 (emphases added), and that its "*investigation of AIG is not complete*" and has not yet "determine[d] whether an enforcement proceeding is appropriate, and if so, the charges to be made in any such proceeding," Mulvihill Decl. ¶¶ 26–27 (emphasis added), in the Consent Order, DFS said that its "*investigation revealed*" that "ALICO, *AIG*, DelAm and MetLife *were soliciting insurance business* in New York without a license," Consent Order at 7–9, ¶¶ 16–17 (emphases added), that "DFS *finds* the … acts and practices of MetLife, *AIG*, ALICO and DelAm *violate* N.Y. Ins. Law §§ 1102, 2102(a) and 2117,"

*id.*, at 9 ¶ 18 (emphases added), and that DFS had already "*concluded* that ALICO, DelAm, and certain AIG subsidiaries and affiliates, *AIG* and MetLife *have solicited* and continue to solicit insurance business in New York on behalf of insurers unlicensed in New York or otherwise aid such insurers," *id.*, at 2 (emphases added).[5]

The Consent Order's explicit findings and conclusions set this case far apart from each of Superintendent Lawsky's cited authorities finding lack of ripeness and standing because here, "the effects of [the Defendant's] actions are 'felt in a concrete way' by" AIG and therefore are ripe for review. *See Bronx Household of Faith v. Bd. of Educ.*, 492 F.3d 89, 111 (2d Cir. 2007) (citation omitted); *see also Susan B. Anthony List*, 573 U.S. at __ (slip op., at 14) ("Finally, the threat of future enforcement of the [statute] is substantial. Most obviously, there is a history of past enforcement here: [the plaintiff] was the subject of a complaint in the recent election cycle. We have observed that past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.' Here the threat is even more substantial given that the [government entity] actually found probable cause to believe that [the plaintiff's] speech violated the [statute].").

Nor is ripeness defeated by DFS's assertion, *see* Motion at 3, 11, 12, 17, that it may yet retreat from the findings and conclusions in its Consent Order.[6] The possibility that a state actor might amend the challenged statutes and regulations or that DFS might refrain from ongoing enforcement of an unconstitutional interpretation of the law always exists and does not make challenges to DFS's actual threatened enforcement action unripe.

---

[5]  Similarly conclusive language can be found in the DFS press release announcing the settlement, which states, *inter alia*, that the "Department's investigation uncovered the extensive insurance activities by ALICO, DelAm, *AIG*, and MetLife related to that business from their respective offices in New York." *See* Press Release, N.Y. Dep't of Fin. Servs., NYDFS Announces MetLife to Pay $60 Million For Insurance Law and Other Violations By Its Subsidiaries ALICO and DelAm (Mar. 31, 2014), *available at* http://www.dfs.ny.gov/about/press2014/pr1403311.htm.

[6]  *See, e.g., Am. Petroleum Ins. v. EPA*, 906 F.2d 729, 739–40 (D.C. Cir. 1990) ("[A]n agency always retains the power to revise a final rule through additional rulemaking. If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely"); *Riva v. Mass.*, 61 F.3d 1003, 1011 (1st Cir. 1995) ("[R]epeal of a statute will always be possible in any case of delayed enforcement, yet it is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe"); *Am. Paper Ins. v. EPA*, 996 F.2d 346, 354–55 n.8 (D.C. Cir. 1993) (case ripe where court had "no way of knowing whether [the EPA] might change its mind down the road"); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 907 F. Supp. 2d 310 (E.D.N.Y. 2012) ("The possibility of a future amendment … that relieves plaintiffs from an obligation to cover contraceptives and renders this action moot is speculative" and does not render the challenge "non justiciable.").

### B.    AIG Has Article III Standing

Superintendent Lawsky contends that AIG lacks all three constitutional components of standing:  injury in fact, causation, and redressability.  Motion at 25–30.[7]  Each of these arguments is grounded on the flawed belief that DFS can render AIG's claims unripe and unredressable simply by asserting that its investigation of AIG is ongoing and that DFS is uncertain of which, if any, charges will be brought against AIG.  *See id*.  The arguments fail.

### 1.    AIG Has Established Injury In Fact

"Injury in fact is a low threshold, which … need not be capable of sustaining a valid cause of action but may be simply fear or anxiety of future harm."  *See Ross v. Bank of Am., N.A.*, 524 F. 3d 217, 222 (2d Cir. 2008).  Superintendent Lawsky does not seriously contend that AIG has failed to establish an injury in fact, relegating his argument to a single footnote.  *See* Motion at 26 n.17.  In that footnote, Superintendent Lawsky argues that AIG cannot meet this threshold, asserting that an injury is not "certainly impending" as required under *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1447 (2013), because an "investigatory proceeding" can never be an injury in fact.  *Id*.[8]

But there is no such "bright-line" rule.  Indeed, if DFS were right, and an enforcement proceeding must be commenced against a plaintiff for there to be an injury in fact, there could be no pre-enforcement actions and the purpose of the Declaratory Judgment Act would be defeated. *Clapper* and *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393 (2d Cir. 2013), upon which DFS relies in support of this argument, *see* Motion at 25–26, 28, stand for the unremarkable proposition that a purported injury based on fears of purely hypothetical future events is insufficient for standing purposes.  *See Clapper*, 133 S. Ct. at 1148 (A theory of standing which "relies on a *highly attenuated* chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." (emphasis added)); *Entergy Nuclear*, 733 F.3d at 428–31 (holding

---

[7]    To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010).  Article III standing "assure[s] th[e] concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

premature a dormant Commerce Clause challenge based on the future *possibility* that the state would carry out its intent to impermissibly condition the granting of a license for continued operation of a nuclear power plant on preferential in-state energy rates).

By contrast, here AIG has alleged far more than "mere intent" on the part of DFS to enforce its unconstitutional interpretation of the law, and AIG's standing does not depend on a host of speculative contingencies.  All that one needs to do to determine that AIG has suffered injury and that further injury is "certainly impending" is to read the plain language of DFS's Consent Order, which clearly states that, based on DFS's unconstitutional interpretation of the law and the facts set forth in the Consent Order (and repeated in the Complaint), AIG violated Sections 1102, 2102(a), and 2117.  This pronouncement alone establishes injury in fact.[9]

Aside from the reputational injury that has already occurred, there is the additional and separate injury of the threatened enforcement proceeding.  *Clapper* confirms that this, too, is a constitutionally cognizable injury, in contrast to the "highly attenuated chain of possibilities" upon which the alleged injury there was based:

> (1) [T]he Government will decide to target the communications of non-U.S. persons with whom [human rights attorneys and reporters] communicate; [*and*] (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; [*and*] (3) the Article III judges who serve on the [FISA] Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; [*and*] (4) "the Government will succeed in intercepting the communications of [plaintiffs'] contacts; *and* (5) [plaintiffs] will be parties to the particular communications that the Government intercepts.

133 S. Ct. at 1148 (emphases added).  In *Clapper*, the government never announced prior to the initiation of that lawsuit, as did DFS here, that it had concluded that interception of respondents'

---

8   The Department's arguments concerning lack of injury in fact also fail for the same reasons that the claims are constitutionally ripe.  *See supra*, § I(A) (and the authorities cited therein).

9   *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2319 (2012) (noting that the FCC's findings that Fox "failed to exercise reasonable judgment, responsibility, and sensitivity to the public's needs" and other findings of wrongdoing "could have an adverse impact on Fox's reputation" and justified relief); *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 160–61 (2d. Cir. 2003) ("The Supreme Court has long recognized that an injury to reputation will satisfy the injury element of standing ….  It is self-evident that [plaintiff's] reputation will be blackened by the Board's finding of misconduct and unfitness."); *McBryde v. Comm. to Review Circuit Council* (footnote continued)

communications was authorized under Section 1881a, and, pursuant to that conclusion, had already intercepted the communications of individuals who were similarly situated to respondents.  Had such facts been present in *Clapper*, they would more than satisfy the "certainly impending" standard.[10]

In short, a plaintiff establishes an injury in fact where an investigating entity has publicly proclaimed "conclusions," based on an already completed investigation, that that plaintiff has violated a law.  *See supra*, § I(A) (and the authorities cited therein).[11]

### 2.    AIG's Claims Satisfy Causation and Redressability Requirements

In addition to injury in fact, a plaintiff must establish that the injury is "fairly traceable" to the defendant and "likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  The Motion asserts that AIG is unable to meet these requirements, because the Amended Complaint specifically identifies Sections 1101(b), 1102(a), 2102(a), and 2117, whereas the "the investigation and alleged behaviors *could* provide a basis for a claim of violations of various legal provisions by AIG that apply to it in its capacity as a holding company, which operate separately from the statutes challenged in this litigation."  *See* Motion at 26–27 (citing "§§ 1509, 2402, 2405 (misuse of holding company system to accomplish illegal conduct or deceptive acts or practices); 1506(c)(1) (violation of trustworthiness requirement by holding company)").

But these provisions are wholly inapplicable, because they are nowhere to be found in the Consent Order (nor part of the constitutional harm that AIG complains of) in which DFS specifically concluded that AIG violated Sections 1102, 2117, and 2102(a), and extracted a $50 million penalty from MetLife and ALICO based on the same conduct it found AIG to have committed.  The DFS's interpretation and enforcement of those statutes are the subject of the claims in the Amended

---

*Conduct and Disability Orders of Judicial Conference of the United States*, 264 F. 3d 52, 57 (D.C. Cir. 2001) (finding that judge established injury in fact where public reprimand was a blight on his reputation).

[10]   In *Susan B. Anthony List v. Driehaus*, 573 U.S. _, _ (2014) (slip op., at 5), the Supreme Court held that an "allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or* there is a '*substantial risk*' that that the harm will occur." (emphases added).  Regardless of whether the standard is "certainly impending" or "substantial risk," AIG has more than satisfied both.

[11]   *See also* Federal Practice and Procedure § 2757 (3d ed.) ("There is little difficulty in finding an actual controversy if all the acts that are alleged to create liability already have occurred.  The court is then merely asked, as in any litigation, to determine the legal consequences of past events and it is immaterial that it may be the one allegedly liable, rather than the person to whom he would be liable, who asks for the judicial determination.").

Complaint, not other, hypothetically applicable statutes, that DFS now seeks to inject in order to avoid judicial review.[12]  Moreover, Superintendent Lawsky overlooks that a ruling from this Court that DFS's conclusion—that AIG violated Sections 1102, 2117, and 2102(a) by "conduct[ing] … insurance activities" and "soliciting insurance business in New York without a license," Consent Order at 7–9, ¶¶ 16–18—is premised on an unconstitutional interpretation of the law, the additional hypothetical violations of statutory provisions that DFS identifies in its Motion would fail, as well. In other words, were the Court to determine that DFS's conduct violates the dormant Commerce Clause, or the Due Process Clause, or the First Amendment, DFS cannot seriously suggest that it could simply charge AIG with some other statutory provision to penalize the very same constitutionally protected conduct.  And a finding from this Court that DFS's interpretation and enforcement of Sections 1102, 2117, and 2102(a) against AIG is unconstitutional (and that DFS may not impose penalties based on its unconstitutional interpretation) will provide AIG with the relief it seeks in this action.  In any event, to the extent that Defendant believes that the entirety of an injury must be relieved in order to be redressable, he is wrong.  *See, e.g.*, *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (A "plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will relieve his every injury.").

## C.    AIG's Claims Are Prudentially Ripe

Superintendent Lawsky next argues that, even if the Court finds AIG's claims constitutionally ripe, the Court should nevertheless dismiss the Amended Complaint on prudential ripeness grounds.  Prudential ripeness (to the extent that it remains a viable doctrine at all[13])

---

[12]   Defendant's reliance on *Jacoby & Meyers, LLP v. Presiding Justices of the App. Div.*, 847 F. Supp. 2d 590, 591 (S.D.N.Y. 2012), to support this argument is surprising, given that the Second Circuit vacated the judgment and remanded to allow plaintiff to amend the complaint to include additional statutes that all parties agreed prohibited the same conduct, 488 Fed. App'x 526, 527 (2d Cir. Nov. 21, 2012).  Contrary to Superintendent Lawsky's representation that "[t]he Second Circuit agreed with [the district court's] holding" on redressability and standing, *see* Motion at 26 n.18, the Second Circuit did not address the issue at all, stating that "*we need not decide the interesting theoretical issues about standing*" because the issues could be and were entirely avoided by giving plaintiff leave to amend.  *Jacoby & Meyers*, 488 Fed. App'x at 527 (emphasis added).

[13]   The Supreme Court recently noted that "the continuing vitality of the prudential ripeness doctrine" has been called into question:  "To the extent respondents would have us deem petitioners' claims nonjusticiable on grounds (footnote continued)

considers the "hardship to the parties of withholding court consideration" and "fitness of the issues for judicial decision." *Abbot Labs. v. Gardner*, 387 U.S. 148, 149 (1967) ("basic rationale" of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements"). Here, both considerations favor immediate review.

The Department argues that there would be no substantial hardship in denying review because (a) "AIG has sold ALICO and DelAm [to MetLife] and there is no allegation that the former functions of the GMD are now carried on elsewhere at AIG," and (b) "there [are] no current enforcement charges against AIG under the challenged provisions, [and] such charges may not issue at all." Motion at 29–30.  In support, DFS relies entirely on *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), in which the Supreme Court dismissed an environmental group's challenge to a federal resource and management plan on prudential ripeness grounds.  But in *Ohio Forestry Assn.*, unlike here, there were *six* separate contingencies that would have had to occur before a single tree could have been cut down (the injury).  *Id.* at 729.[14]  Because the injury could be entirely avoided, withholding immediate judicial review did not impose a substantial hardship.  *Id.* at 734.

Not so here, where DFS already concluded (based on an unconstitutional interpretation) and publicly announced that AIG violated the law, and further injury is "certainly impending" based on the threatened enforcement proceeding to enforce those conclusions.  Where the enforcement of a statute or regulation is certain and the only "impediment" to ripeness is a delay before the proceedings commence, Courts do not hesitate to find a challenge prudentially ripe.  *See, e.g.*, *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable

---

that are prudential, rather than constitutional, [t]hat request is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List*, 573 U.S. at _, (slip op., at 17–18) (citations and quotations omitted).

[14]   Specifically, before a single tree would be cut, the following would have to occur:  (1) a specific area for logging would need to be proposed, *and* (2) the agency would need to confirm that the proposed project conformed the development plan, *and* (3) the agency would need to provide those impacted by the proposed logging with notice and an opportunity to be heard, *and* (4) the agency would be required to confirm that the plan satisfied certain environmental analyses required by law, *and* (5) the agency would need to make a final determination to permit logging, and (6) the plaintiffs would need to lose both the administrative appeals process and judicial review thereof. *Id.* at 729–30.

controversy that there will be a time delay before the disputed provisions come into effect."); *see also Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) (holding that a takings claim was ripe for review even though a plan for development had not been submitted to state court, because similar requests for development had been denied).

For much the same reasons, the case is fit for review.  The principal consideration for fitness is whether the record is factually adequate to enable the court to make the necessary legal determinations; "the more that the questions presented are purely ones of law, and less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa."  *Artway v. Attorney Gen. of State of N.J.*, 81 F.3d 1235, 1249 (3d Cir. 1996).

There can be no doubt of the factual adequacy of the record here.  At the April 28, 2014 hearing, Defendant's counsel initially stated that there was no need for discovery in this litigation, apparently recognizing that this action concerns a well-developed factual record and purely legal issues.[15]  *See* Hr'g Tr. at 20:1–6, Ex. A to Michael B. Carlinsky Decl. ("[A]nd I agree with them that … basically that the issues are, if we need to get to them, they would be primarily legal issues.").  That initial statement was correct, for AIG's claims involve legal issues based on a well-developed factual record memorialized in the Consent Order.  Although Defendant now conclusorily asserts, Motion at 12, that additional facts must be developed, tellingly the Motion does not provide any specificity as to what additional factual investigation is needed with respect to the statutes at issue in this case or why, and should be disregarded.  And while the Motion attempts to couch the facts in the Consent Order as simply what "ALICO[] admitted," *see* Motion at 2, the Consent Order itself states that the detailed facts are DFS's official "*findings*" pursuant to its three year long "*investigation*"

---

[15]  After conferring with colleagues, Defendant's counsel reversed course and asserted that "our office feels strongly that in [the] event we survive the motion to dismiss there would be discovery."  Hr'g Tr. at 22:20–23.  Defendant's counsel went on to explain that "I am told that DFS strongly disputes AIG's characterization of their activities in New York and the scope of them.  And therefore, that's obviously a subject on which discover[y] should be taken."  *Id.* at 23:2–23.  Yet the Amended Complaint's characterization of the activities in New York are lifted directly from the Consent Order that DFS entered, and aside from vague and conclusory assertions that additional facts must be developed, the Motion does not identify any relevant alleged factual disputes or mischaracterizations.  Moreover, the factual recitations in the Motion and Mulvihill Declaration mirror the finality and "official findings" narrative in the Consent Order.  *See, e.g.*, Motion at 9 ("ALICO … made intentional factual misrepresentations"), 10–11 ("ALICO was marketing, soliciting and negotiating the sale of insurance products in New York … through the Group Management Division," which was not "licensed in New York"); Mulivhill Decl. ¶ 23.

that had "*concluded*" that AIG (among others) violated the law.  *See* Consent Order at 1–2 (emphases added).[16]  As is plain from the Amended Complaint, the questions presented are "purely legal issues which do not require further factual development," and therefore the action is fit for review.  *See Susan B. Anthony List*, 573 U.S. at _ (slip op., at 18) (challenge to state law penalizing certain false statements made during the course of a political campaign on First Amendment grounds "presents an issue that is purely legal and will not be clarified by further factual development" (quotations and citation omitted)); *United States v. Olivencia*, 689 F. Supp. 1319, 1322–23 (S.D.N.Y. 1988) (criminal defendant's challenge to sentencing guidelines was ripe because the court's decision would assist in making an informed decision about pleading guilty).

### D.  Declaratory Judgment Would Provide "Conclusive" Relief

Superintendent Lawsky's request for discretionary denial of declaratory relief is just as unfounded.  A district court should exercise its discretion to hear a declaratory judgment action where, as here, pure legal questions are at issue, and a decision in this action will "offer relief from uncertainty and serve a useful purpose in clarifying the rights of the parties … and assisting the parties in formulating settlement positions and developing settlements strategies." *SR Int'l Bus. Ins. Co. v. Allianz Ins. Co.*, 343 Fed. App'x 629, 632 (2d Cir. 2009) (citing *Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005)).  Here, a declaration that DFS's interpretation and enforcement of Sections 1101(b)(1), 1102(a), 2117, and 2102(a) is unconstitutional would "settle the controversy" with respect to DFS's positions that ALICO, AIG, or both should have been licensed in New York and now is subject to substantial penalties for failing to have done so.  A declaration would most certainly "serve a useful purpose in clarifying or settling

---

[16]   The Mulvihill Declaration in support of the motion to dismiss the original complaint was itself internally inconsistent and contradictory.  *Compare* Dkt. 20, Original Mulvihill Decl. ¶ 12 ("DFS is *investigating whether* AIG, ALICO … were soliciting and negotiating insurance in New York with major multinational companies") *with id.* ¶ 17 ("ALICO *was in fact* marketing, soliciting and negotiating the sale of insurance products in New York with the representatives of multinational companies with offices in New York through the Group Management Division," which "was, at different times, a division of AIG, and of various AIG subsidiaries").  Superintendent Lawsky apparently recognized this inconsistency, and the revised Mulvihill Declaration now asserts that "DFS's investigation considers … whether and how ALICO and other AIG subsidiaries and affiliates were in fact soliciting, selling and negotiating the sale of insurance products in New York with multinational companies through AIG's Group Management Division."  Mulvihill Decl. ¶ 20.  But this is rebutted by DFS's own Consent Order.

the legal issues involved." *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006) (quotations and citation omitted).[17]

DFS contends that *Calderon v. Ashmus*, 523 U.S. 740, 746–48 (1998) and *Public Serv. Comm'n v. Wycoff*, 344 U.S. 237, 244–46 (1952) somehow establish that this Court should exercise its discretion to dismiss the Amended Complaint.  *See* Motion at 24.  But these authorities demonstrate the opposite.  Unlike the declaration sought by a death row inmate in *Calderon*—which involved a collateral legal issue related to federal habeas proceedings (whether a federal statute providing for a condensed timetable was applicable to California death row inmates)—the declaration AIG seeks here is far from collateral and would provide final and conclusive relief.  *Calderon*, 523 U.S. at 740.[18]  Nor does AIG seek a purely "advisory" opinion as to whether certain conduct constitutes activity within the ambit of a statute, divorced from "any risk of suffering penalty, liability or prosecution" as in *Wycoff*, 344 U.S. at 244.  Instead AIG "request[s] an adjudication that [a company like ALICO] has a right to do" the activities in New York without obtaining a New York license, and that the DFS "is without power to" pursue enforcement proceedings against AIG in light of the unconstitutionality upon which such an enforcement proceeding is premised.  *See id.* at 240.  This declaratory judgment action has "matured" into an actual "case or controversy," *id.* at 245, and would provide conclusive and final relief that is not at all collateral, *see Calderon*, 523 U.S. at 747.

Defendant's fallback arguments that AIG's action is "blatant procedural fencing" and would be more appropriately decided in an Article 78 proceeding where the "state court would have a factual record" are just as unavailing.  *See* Motion at 24–25.  AIG simply seeks to protect its

---

[17] Courts in the Second Circuit issue declaratory relief as a matter of discretion based on the following: "(i) whether the judgment will serve a useful purpose in clarifying or settling the issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or race to res judicata"; (iv) whether the use of declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy." *Gonzales*, 459 F.3d at 167 (quotation and citation omitted).

[18] Whereas a "judgment in [the Calderon] action … would not resolve the entire case or controversy" in any substantive manner, "but would merely determine a collateral legal issue governing certain aspects of their pending (footnote continued)

constitutional rights in the face of DFS's unconstitutional interpretation and enforcement of the Insurance Law, based upon a well-developed factual record in which DFS has already extracted a massive penalty (from MetLife) and proclaimed AIG itself to have violated the New York Insurance Law.

This is the textbook case for a declaratory judgment, and DFS's speculation that, at some later point in time, its theory may change and it may assert that AIG violated other statutory provisions or none at all is a red herring.[19]  The question as to whether AIG has suffered an injury, however, requires no speculation:  DFS announced in the Consent Order that AIG violated the New York Insurance Law.

AIG has already been conclusively deemed in violation of New York Insurance Law in a well-publicized Consent Order.  There is no question that AIG has been injured, and the threat of additional future injury is "certainly impending."  AIG's claims are therefore ripe and AIG has indisputable Article III standing.

## II.    ABSTENTION IS NEITHER COMPELLED NOR APPROPRIATE

The Supreme Court has repeatedly emphasized that the abstention doctrines are very narrow, and that federal courts must exercise their jurisdiction unless certain "exceptional circumstances" are present.  *Sprint Comm'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* [*NOPSI*], 491 U.S. 350, 368 (1989)).  Nevertheless, DFS urges the Court to abstain under *Younger v. Harris*, 401 U.S. 37 (1971), under *Burford v. Sun Oil*, 319 U.S. 315 (1943), under *R.R. Comm'n of Texas v. Pullman*, 312 U.S. 496 (1941), or all three.  Because this action does not implicate an ongoing enforcement proceeding or otherwise interfere

---

or future suits," *id*. at 747, here the declaration sought by AIG would put a permanent end to DFS's unconstitutional interpretation and enforcement of Sections 1101, 1102, 2117, and 2102(a).

[19]    Numerous courts have considered and rejected this type of argument.  *See, e.g.*, *CSI Aviation Servs., Inc. v. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (rejecting an agency's mootness argument based on a proposed rulemaking where the existing agency action already imposed injury); *Am. Petroleum Ins.*, 906 F.2d at 739–40 (agency cannot render controversy unripe simply by alleging that it may alter its allegedly unconstitutional conduct going forward because "review could be deferred indefinitely"); *Roman Catholic Archdiocese*, 907 F. Supp. 2d at 331 ("[T]he First Amendment does not require citizens to accept assurances from the government that, if the government later determines it has made a misstep, it will take ameliorative action."); *Cf. City News & Novelty v.* (footnote continued)

prematurely with the ongoing development and articulation of state law and policy, none of these abstention doctrines is applicable in this case, and this Court must exercise its jurisdiction.

**A.     *Younger* Is Not Applicable Because There Is No Ongoing State Proceeding**

The Supreme Court recently reaffirmed that *Younger* abstention is permitted only in rare, "exceptional" circumstances, specifically, when there are: (1) *ongoing* state criminal proceedings; (2) certain *ongoing* state civil enforcement proceedings; or (3) *ongoing* state civil proceedings "uniquely in furtherance of the state courts' ability to perform in their judicial functions." *Sprint Comm'ns, Inc.* 134 S.Ct. at 591 ("We have not applied *Younger* outside these three 'exceptional' categories, and today hold, in accord with *NOPSI,* that they define *Younger*'s scope.") (citations omitted). This case does not fall within any of these categories.

DFS's position that the issuance of investigatory, "office" subpoenas renders its investigation an ongoing civil enforcement proceeding is misguided and inconsistent with the purpose of the *Younger* doctrine.[20]   The court in *Guillemard–Ginorio v. Contreras–Gomez*, 585 F.3d 508 (1st Cir. 2009) was faced with facts remarkably similar to the case before the Court.   In *Guillemard-Ginorio*, insurers brought constitutional claims against the Office of the Insurance Commissioner ("OIC") of Puerto Rico.   The plaintiffs filed their suit after the OIC had issued a Notice of Investigation, commenced the investigation, and issued subpoenas in furtherance of the investigation.   Moreover, as in the present case, in *Guillemard-Ginorio*, the plaintiff's suit was triggered by disparaging remarks by the Insurance Commissioner about the owners of the insurance companies.   Critically, the plaintiffs filed their federal suit before the OIC had issued an Order against them for alleged violations of the Insurance Code.   *Id.* at 510–13.   The OIC argued that the federal court should abstain under *Younger* on the same grounds DFS presses here, that the issuance of the subpoenas commenced a state civil enforcement proceeding that was ongoing when the plaintiffs filed suit.   The First Circuit rejected this argument because, "while the threat of enforcement against plaintiffs for

---

*City of Waukesha*, 531 U.S. 278, 284 n. 1 (2001) (stating that "voluntary cessation … rarely moots a federal case" because "a party should not be able to evade judicial review … by temporarily altering questionable behavior").

[20]   The Department apparently concedes that neither the first nor third scenario identified in *Sprint* is applicable here.

insurance code violations had been raised at the time plaintiffs filed their federal complaint by virtue of the continuing OIC investigation, nothing resembling formal enforcement proceedings had yet commenced." *Id.* at 520–21.

In reaching this decision, *Guillemard-Ginorio* relied on *Telco Commc'ns, Inc. v. Carbaugh*, which held that *Younger* abstention was inappropriate where a state agency initiated neither a formal hearing nor a formal request for prosecution. 885 F.2d 1225, 1227–30 (4th Cir. 1989). In *Telco*, prior to the commencement of the federal case, the federal plaintiff and the Virginia Office of Consumer Affairs had held a fact-finding conference during which the participants were not sworn, there was no opportunity for direct or cross-examination, and there was no record of the proceeding. Such a proceeding was not "judicial in nature" and lacked the "trial-like trappings" that are necessary for an administrative proceeding to qualify for *Younger* abstention. *Id.* at 1228. Much like the Department's argument here, the dissent's belief in *Telco* that abstention is required "[n]o matter how egregious the state's infringement of constitutional rights or how incipient the stage of administrative proceedings ... converts a doctrine of comity into a blanket permission for the prolonged commission of unconstitutional acts. It would allow any state agency to persist in conduct that is patently unconstitutional." *Id.* at 1229.

Similarly, in *Schiavone Constr. Co. v. N.Y. City Transit Auth.*, 593 F. Supp. 1257 (S.D.N.Y. 1984), the plaintiff sought to enjoin the Bronx District Attorney's Office from prosecuting it for alleged false statements. In addressing the plaintiff's allegation that the defendants had acted in bad faith, Judge Sand noted that because "no indictment has yet been returned against plaintiffs in state court," the court did "not understand defendants to argue that the precise holding of *Younger v. Harris* (federal court should not enjoin a pending state criminal prosecution) should operate as a bar to federal judicial intervention in this case." *Id*. at 1258 n.4 (citations omitted). Despite the fact that a grand jury had been empanelled and the defendants had begun presenting evidence to it, the absence of a formal charge rendered *Younger* inapplicable. Likewise, the court in *Alvarez v. City of New York* declined to abstain under *Younger* in a suit seeking to enjoin a New York Police

Department internal investigation. 2 F. Supp. 2d 509, 516 (S.D.N.Y. 1998) (*Younger* abstention was unwarranted "because no formal proceeding has yet been initiated") (citation omitted).[21]

Against these well-reasoned authorities, Superintendent Lawsky offers a handful of unpublished district court opinions, but none is persuasive. First, the weight of authority is against finding that mere issuance of subpoenas creates an ongoing state civil enforcement proceeding. *See, e.g.*, *Guillemard-Ginorio*, 585 F.3d 508; *Telco Comm'ns*, 885 F.2d 1225; *Schiavone Constr. Co.*, 593 F. Supp. 1257; *cf. Alvarez*, 2 F. Supp. 2d 509. This rule is faithful to, and better comports with, the Supreme Court's decision in *Younger* and its progeny, in which federal courts abstained where a formal state charge had already been filed.[22] As Judge Wilkinson explained in *Telco Communications*:

> *Younger* abstention represents an accommodation between a state's pursuit of important interests in its own forum and the federal interest in federal adjudication of federal rights. We decline to hold that *Younger* abstention is required whenever a state bureaucracy has initiated contact with a putative federal plaintiff. Where no formal enforcement action has been undertaken, any disruption of state process will be slight. While important state interests are present in connection with this or any state statute, the strength of those interests will be respected by any court assessing a plaintiff's constitutional claims. *Appellant's contention—that abstention is required whenever enforcement is threatened—would leave a party's constitutional rights in limbo while an agency contemplates enforcement but does not undertake it.*

885 F.2d at 1229 (emphasis added) (quotations and citations omitted). Thus, until a state initiates a formal enforcement action, the state interests in investigating are subordinate to the federal interests in vindicating constitutional rights.[23] By DFS's own admission, it has not yet commenced a formal proceeding, and the "continuing" "investigation of AIG is not complete." Mulvihill Decl. ¶¶ 25–26.

---

[21] Although the court suggested that principles of comity weighed in favor of allowing the internal investigation to run its course without federal court intervention, that result was not mandated by Younger.

[22] *See, e.g.*, *Younger*, 401 U.S. at 38–39 (state officials had obtained indictment and actively were prosecuting federal plaintiff in state criminal action when plaintiff filed federal complaint); *Samuels v. Mackell*, 401 U.S. 66 (1971) (same); *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 428–29 (1982) (by the time plaintiff filed his federal complaint, the state disciplinary organization had already formally charged plaintiff under the very rule that was the subject of his federal complaint).

[23] Indeed, this reading of "ongoing proceeding" is consistent with other areas of the law. For example, the New York State Administrative Procedures Act defines "Adjudicatory Proceeding" as "any activity which is not a rule making proceeding or an employee disciplinary action before an agency ... in which a determination of the legal rights, duties or privileges of named parties thereto is required by law to be made *only on a record and after an opportunity for a hearing*." N.Y. A.P.A. § 102(3) (emphasis added).

The decisions DFS cites are distinguishable in any event.  In *Mir v. Shah*, the State Department of Health had, in fact, initiated referral proceedings (and a formal charging document) against the federal plaintiff, which proceedings were "well under way" before the federal action was filed.  2012 WL 6097770, at *3 (S.D.N.Y. Dec. 4, 2012).  Thus, any *dicta* in *Mir* (to borrow DFS's characterization, *see* Motion at 15) is inapplicable here, where DFS has merely issued investigatory office subpoenas.  Similarly, in *Cuomo v. Dreamland Amusements, Inc.*, 2008 WL 4369270, at *10 (S.D.N.Y. Sept. 22, 2008), and *J. & W. Seligman & Co. v. Spitzer*, 2007 WL 2822208, at *3 (S.D.N.Y. Sept. 27, 2007), there was active state court litigation over the investigations, which sets those cases apart from the present case, in which AIG is complying with the subpoenas.  Likewise in *Hip-Hop Summit Action Network v. New York Temporary State Commission on Lobbying*, the court found that state agency's "investigatory phase seems to be at an end."  2003 WL 22832569, at *5 (S.D.N.Y. Nov. 25, 2003).

But even if these unreported decisions were factually apposite, which they are not, they are inconsistent with the Supreme Court's admonition in *Sprint* that *Younger* abstention cannot be extended beyond the three circumstances identified in *NOPSI*.  *See Sprint*, 134 S. Ct. at 593–94.  With respect to quasi-judicial proceedings, the cases identified in *NOPSI*, 491 U.S. at 368, were *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 598 (1975) (*Younger* abstention applies to federal complaint filed *after* and challenging Ohio state court's judgment in a nuisance proceeding), *Trainor v. Hernandez*, 431 U.S. 434, 437 (1977) (*Younger* abstention applies to federal action challenging constitutionality of statute that was filed *after* state entity had "filed a lawsuit" in state court against the federal plaintiff), and *Moore v. Sims*, 442 U.S. 415, 418–20 (1979) (*Younger* abstention applies to bar challenge to state law where federal action was filed after state entity had already instituted court proceedings against the federal plaintiff).  The Supreme Court has never recognized, and *NOPSI* did not identify, the issuance of administrative subpoenas, alone, as sufficient for purposes of *Younger*; instead, in each case identified by *NOPSI*, formal state proceedings had already commenced *prior to* the federal action.  Thus, to the extent decisions cited by Superintendent Lawsky have recognized the issuance of administrative subpoenas as triggering *Younger* abstention,

they have been abrogated by the Supreme Court's declaration in *Sprint* that, "to guide other federal courts, we today clarify and affirm that *Younger* extends to the three 'exceptional circumstances' in *NOPSI*, but *no further*." 134 S. Ct. at 593–94 (emphasis added). *See also Mullholland v. Marion*, 746 F.3d 811, 817 (7th Cir. 2014) (applying *Sprint* to hold that a planned investigatory hearing was not sufficient to trigger *Younger* where formal charges were not "imminent").[24]

Moreover, Superintendent Lawsky's position is further undermined by DFS's own admission that it has not yet commenced an enforcement proceeding against AIG. Mulvihill Decl. ¶ 26 ("DFS is continuing its investigation to determine whether an enforcement proceeding is appropriate...."); Motion at 12 ("DFS has not completed its factual investigation of AIG ... and does not expect its investigation to be complete for some time"); *id.* at 29 ("[T]here are no current enforcement charges against AIG").

However, even if the Court were inclined to adopt Superintendent Lawsky's questionable construction of "ongoing proceeding," the extraordinary nature of this case counsels against this Court's abstention. DFS has already concluded that "AIG ... violate[d] §§ 1102, 2102(a) and 2117." Consent Order at 9, ¶ 18. The DFS did so without providing AIG the chance to defend itself and instead negotiated solely with MetLife and its subsidiaries, including ALICO. And while AIG had no say in that Consent Order, DFS has secured MetLife's "full[] cooperat[ion] with DFS' [i]nvestigation of ... *AIG concerning ... AIG's violations* of sections 1102, 2102 and 2117 of the Insurance Law." Consent Order at 10, ¶ 4 (emphases added). Far from the ordinary course of regulatory proceedings in which formal conclusions and findings are reserved until after a party has had the opportunity to present its case, seek a settlement, or both, DFS has summarily concluded,

---

[24]  *See also United States v. S.C.*, 720 F.3d 518, 527 (4th Cir. 2013) (declining to apply *Younger* abstention and noting the "distinction between the commencement of 'formal enforcement proceedings,' at which point *Younger* applies, versus the period of time when there is only a 'threat of enforcement,' when *Younger* does not apply" (citing *Telco*)); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012) ("*Younger* abstention is appropriate only when there is an action in state court against the federal plaintiff and the state is seeking to enforce the contested law in that proceeding." (citation and quotation omitted)); *O'Keefe v. Schmitz*, 2014 WL 1379934, at *2–*3 (E.D. Wisc. Apr. 18, 2014) (post-*Sprint* decision noting that *Younger* abstention is not applicable until a formal "proceeding is actually commenced"); *cf. Fund v. City of New York*, 2014 WL 2048204, at * 2, *7 (S.D.N.Y. May 19, 2014) (post-*Sprint* decision abstaining under *Younger* after formal adjudicatory hearing had already been completed and the ALJ's Report and Recommendations was released).

and announced to the world, that AIG violated the law.  DFS seeks to use its powerful status as a regulator to bully AIG into submitting to DFS's unconstitutional interpretation of the statute, and, in doing so, unfairly and severely harms AIG's business reputation.[25]  Such statements make clear that the DFS has already reached a conclusion about AIG's fate and that the result of any state proceeding is a foregone conclusion.

In *Gibson v. Berryhill*, 411 U.S. 564 (1973), the Supreme Court affirmed an injunction against an ongoing license revocation proceeding pending before the Alabama Board of Optometry. The Board previously had pursued the federal plaintiffs in a state court action dealing with substantially the same issues, as a result of which the District Court held the Board already had reached a determination and would not provide the plaintiffs with a fair and impartial hearing. *Id.* at 565–70.  The Supreme Court affirmed on the District Court's alternative grounds—that members of the Board had a financial interest in the decision that rendered them biased—but noted that, "[a]rguably, the District Court was right on both scores."  *Id.* at 579.  Similarly, in *Wickes v. Ward*, 1988 WL 5384, at *4 (S.D.N.Y. Jan. 13, 1988), the court declined to abstain in part because the hearing officer impugned the credibility of a material witness prior to the hearing.  The Court explained, "[p]rejudgment by a member of a tribunal may render it incompetent.  The alleged statements made by Commissioner Poretz demonstrated prejudgment of a material witness to plaintiff's case thus calling into question whether the administrative tribunal is competent to render a fair and impartial judgment on plaintiff's federal claims."  *Id.* (citation omitted).  Here, it is not merely one member of a tribunal, but the *entire* Department and Superintendent himself, who have stated publicly and unambiguously that they have reached a judgment on what they now purport to "continue to investigate."  *See* Motion at 11.

DFS's statements in the Consent Order and other public releases make clear that the result of any hearing before DFS is a foregone conclusion—precisely the scenario the Supreme Court sought

---

[25]   Other DFS statements have been equally inflammatory.  *See, e.g.*, AIG Sues NY Regulator Over Probe of Insurance Marketing, Reuters, Apr. 3, 2014, http://www.reuters. com/article/2014/04/03/aig-dfs-idUSL1N0MV2A520140403 (quoting a spokesman for Defendant Lawsky, "AIG may not want to cooperate with our probe, but they are not above the law – no matter how big or powerful they may be.").

to prevent in *Gibson*.  There is no state proceeding in favor of which the Court can abstain, but even if there were, the unusual nature of this case makes it appropriate that this Court exercise its jurisdiction.

> **B.**     ***Burford* Abstention Is Inappropriate Because There Is No Risk Of Interfering With A Complex Administrative Scheme**

DFS's second argument for abstention centers on the Supreme Court's decision in *Burford*, 319 U.S. 315, but like *Younger* abstention, *Burford* abstention has no place in this proceeding. *Burford* abstention is a discretionary doctrine designed to balance the strong federal interest in vindicating constitutional rights and states' interests in maintaining uniformity in the treatment of local problems. *NOPSI*, 491 U.S. at 362. But "[t]his balance only rarely favors abstention, and the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (citations and quotations omitted).

*Burford* abstention is clearly inappropriate in cases like this where there is no danger of a federal court overturning a state court or agency's prior order and thereby disrupting ongoing state efforts to establish a uniform policy. *See Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 117 (2d Cir. 1998) ("The danger which *Burford* abstention avoids [is] creating an opportunity to overturn a prior state court or agency determination by seeking federal court review, thereby disrupting a state administrative apparatus…."). Indeed, as discussed above, there is no ongoing state proceeding, determination, or order with which this Court could possibly interfere.  Moreover, the factors that guide courts' determination of whether federal review impermissibly would interfere with state efforts to establish a coherent policy—*i.e.*, "the degree of specificity of the state regulatory scheme," "the need to give one or another debatable construction to a state statute," and whether the subject matter of the litigation is traditionally one of state concern," *see Aurelius Capital Master, Inc. v. MBIA Ins. Corp.*, 695 F. Supp. 2d 68, 72–73 (S.D.N.Y. 2010) (quoting *Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir. 1998)—make clear that abstention under *Burford* is inappropriate here.

*First*, DFS cites several decisions that purport to describe the "'complex administrative and judicial system for regulating' the insurance industry,"[26] but fails to acknowledge that these cases involve *liquidating* insurance companies and, in a material (and telling) omission, that the Second Circuit has expressly disavowed their relevance outside that context.  In *Alliance of American Insurers v. Cuomo*, the Second Circuit made clear that a constitutional challenge to a provision of the New York Insurance Law did not call for *Burford* abstention because "this action is not a liquidation case.…  Prior cases recognizing the need for federal courts to abstain from interfering with the Superintendent's exercise of authority over insolvent insurance companies are simply not controlling."  854 F.2d 591, 600 (2d Cir. 1988); *see also Aurelius Capital Master*, 695 F. Supp. 2d at 73 (quoting *Alliance of Am. Insurers* and distinguishing decisions such as *Levy v. Lewis*).

In *United Services Auto. Ass'n v. Muir*, a plaintiff challenged a licensing provision of Pennsylvania insurance law.  The Third Circuit reversed the district court's decision to abstain under *Burford* because "[t]he state proceeding merely involves reading and construing a statute, a task for which courts are best equipped, and not administrative factual determinations, such as are involved in the setting of a proper utility rate."  792 F.2d 356, 364–65 (3d Cir. 1986).  In this case, AIG's claims entail no more than any other constitutional challenge: an analysis of whether the Department's construction and enforcement of state law comports with the U.S. Constitution.  Just like *United Services*, there are no factual determinations or policy judgments that a state administrative complex would be better placed to make, "no complicated regulatory scheme is involved," and DFS "has not suggested any peculiar local conditions or special expertise required to interpret the statute."  *Id.*  Resolution of AIG's claims does not "meddle in a complex state scheme," *Hachamovitch*, 159 F.3d at 698; it merely requires constitutional analysis of the sort federal district courts are particularly well suited to undertake.

*Second*, as discussed below, the Court need not engage in any statutory construction, because for the purposes of this suit, the question is whether the Department's stated construction, and its

---

[26]  *See* Motion at 18–19 (citing *Levy v. Lewis*, 635 F.2d 960, 963 (2d Cir. 1980) and *Law Enforcement Ins. Co. v. Corcoran*, 807 F.2d 38, 43 (2d Cir. 1986)).

intention to levy penalties against AIG based on that construction, are unconstitutional.[27]  Because the Superintendent has stated clearly his interpretation of the relevant statutes, there is no occasion for the Court to "give one or another debatable construction to a state statute," *Hachamovitch*, 159 F.3d at 697, as opposed to invalidating the Superintendent's own construction.

*Third*, although insurance regulation traditionally is a state concern, numerous cases have made clear that *Burford* abstention is inappropriate if the state's regulations violate the federal constitution, even in the face of a substantial state interest.  *Hachamovitch*, 159 F.3d at 698; s*ee, e.g.*, *Alliance of Am. Insurers v. Cuomo*, 854 F.2d at 601 (2d Cir. 1988) ("'The state has no right to an unconstitutional policy, coherent or otherwise.'" (quoting *Allstate Ins. Co. v. Sabbagh,* 603 F.2d 228, 232 (1st Cir. 1979))); *see also Zablocki v. Redhail*, 434 U.S. 374, 380 n.5 (1978) ("There is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.").

And *fourth*, this is not a situation where the Department's interpretation of New York insurance law and policy is in flux or yet to be articulated, and a decision from this Court would impermissibly hinder that process.  Rather, DFS has already and unambiguously pronounced its interpretation of the law and, based on that interpretation, has publicly concluded that AIG's conduct violated the law while enforcing the interpretation by extracting a $50 million settlement from MetLife for the very same conduct.  All the Court need do here is to determine whether the Department's enforcement is unconstitutional.[28]

---

[27]  Thus, *Burford* abstention is not warranted because this Court need not parse any complex regulatory scheme or attempt to balance competing interests of state policy and law.  Rather, much like in *NOPSI*, no inquiry beyond the "four corners" of the Consent Order is required to assess whether the Department's interpretation and enforcement of the statutes at issue is unconstitutional.  *NOPSI*, 491 U.S. at 363.

[28]  Superintendent Lawsky's reference to the primary jurisdiction doctrine is equally unavailing.  The primary jurisdiction doctrine applies where complicated factual issues are best decided by an administrative agency.  *See Johnson v. Nyack Hosp.*, 964 F.2d 116, 122–23 (2d Cir. 1992) ("Primary jurisdiction thus recognizes that even though Congress has not empowered an agency to pass on the *legal* issues presented by a case raising issues of federal law, the agency's expertise may, nevertheless, prove helpful to the court in resolving difficult *factual* issues.... Primary jurisdiction allows an agency to pass on factual issues that require specialized, technical knowledge.") (emphasis in original).  But, as the Department asserts, AIG's suit presents "pure issues of State law." Motion at 20.  Thus, by the Department's own admission, the primary jurisdiction doctrine has no application here.  Moreover, a party need not submit to and exhaust administrative remedies where, as here, the party challenges the constitutionality of the agency's actions.  *See, e.g.*, *Watergate II Apartments v. Buffalo Sewer Auth.*, 46 N.Y.2d 52, 58 (1978) ("[t]he exhaustion rule ... need not be followed, for example, when an agency's action is challenged as (footnote continued)

**C.   Discretionary *Pullman* Abstention Is Inappropriate Where The State's Conduct Is Chilling Commercial Speech Safeguarded By The First Amendment**

Finally, DFS urges the Court to abstain under *Pullman*, which gives federal courts the discretion to decline to decide a constitutional challenge to a state statute if the statute is fairly susceptible of an interpretation by a state court that would avoid the constitutional infirmity. *See Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 385 (2d Cir. 2000). Abstention under *Pullman* is, like *Burford*, an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* (citation omitted). Thus, in deciding whether to abstain under *Pullman*, "federal courts are instructed to engage in a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.* (citations and quotations omitted).

The Superintendent argues that New York State courts should have an opportunity to reject his interpretation of Sections 1101, 1102, 2102, and 2117 before this Court declares DFS's interpretation and enforcement unconstitutional. Motion at 21–23. This request for *Pullman* abstention fails because *Pullman* requires an unsettled question of state law, and the Consent Order and DFS's position in this case have made unequivocal what DFS's position is, *see* Motion at 10–11 ("ALICO was marketing, soliciting and negotiating the sale of insurance products in New York"); Consent Order at 9, ¶¶ 17–18 ("In fact, ALICO, AIG, DelAm and MetLife were soliciting insurance business in New York without a license. DFS finds the foregoing acts and practices of MetLife, AIG, ALICO and DelAm violate N.Y. Ins. Law §§ 1102, 2102(a) and 2117."), which is all that matters for purposes of this lawsuit. *See Jacoby & Meyers, LLP*, 488 F. App'x at 527 (*Pullman* abstention is inappropriate where a state governmental authority asserts that the state law in question unambiguously prohibits the conduct at issue). AIG does not seek this Court's views on the interpretation of New York Insurance Law; rather, AIG seeks this Court's judgment on the

---

either unconstitutional or wholly beyond its grant of power, or when resort to an administrative remedy would be futile or when its pursuit would cause irreparable injury"); *GTE Spacenet Corp. v. N.Y. State Dep't of Taxation & Fin.*, 201 A.D.2d 429 (N.Y. App. Div. 1st Dep't 1994) (party need not exhaust administrative remedies where the party claims that the statute is wholly inapplicable).

constitutionality of DFS's own unambiguous and allegedly "long-standing position," *see* Motion at 7, on how that law should be interpreted.

Moreover, Superintendent Lawsky ignores entirely that *Pullman* abstention is inappropriate where important First Amendment rights are imperiled by a state actor's ongoing conduct. The Second Circuit has consistently recognized that "[t]o force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Vt. Right to Life*, 221 F.3d at 385–86 (citation omitted). In *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, the Second Circuit affirmed the District Court's injunction against the State Liquor Authority's unconstitutional regulation of commercial speech, notwithstanding the fact that New York State courts could have avoided the constitutional question by finding the specific regulations were outside the power granted to the Liquor Authority by the enabling statute. 134 F.3d 87, 93–94 (2d Cir. 1998). Applying *Pullman* would have been inappropriate because "[a]bstention would risk substantial delay while [the plaintiff] litigated its state law issues in the state courts." *Id.* at 94.

This case presents a situation similar to that faced in *Bad Frog* and *Vt. Right to Life*. DFS's construction and enforcement of the Insurance Law has deeply unsettled the industry. Since the Consent Order became public, insurance companies have had no choice but to forego legitimate commercial speech safeguarded by the First Amendment because of the risk that DFS will seek to extract millions of dollars from them as it has done from MetLife and seeks to do from AIG. Among the uncertainties insurers now face is whether an agent of a non-New York insurer that is not licensed in New York is now prohibited from speaking with people who happen to be physically present in New York even if neither the agent nor her interlocutor is a resident of New York.[29] In other words, foreign and alien insurers understandably may believe that the only way to ensure that

---

[29]   For one example of an industry publication on the chilling effect, *see* Jorden Burt, *Considerations for Insurers in the Aftermath of the MetLife Consent Decree*, CARLTON FIELDS BULLETIN (Apr. 17, 2014*), available at* http://m.cfjblaw.com/considerations-for-insurers-in-the-aftermath-of-the-met-life-consent-decree/. At the appropriate time, AIG intends to put forth additional evidence demonstrating the negative ramifications that the Consent Order has had on the industry, including through insurance experts such as former Superintendents of the Department of Insurance.

DFS will not seek to penalize them is to direct their employees never to speak with a client anytime one or the other of them is physically present in New York. Forcing AIG and the rest of the industry to engage in such self-censorship through the delay and expense of litigating these issues in state court is inappropriate in this context. *See Vt. Right to Life*, 221 F.3d at 384–86; *Bad Frog Brewery*, 134 F.3d 87, 93–94.

## III.   THE AMENDED COMPLAINT STATES SERIOUS CONSTITUTIONAL CLAIMS WITH MORE THAN ADEQUATE PARTICULARITY TO SURVIVE DISMISSAL

AIG's Amended Complaint asserts that DFS's interpretation of, and conclusion that AIG violated, the New York Insurance Law violates the (i) the dormant Commerce Clause, (ii) the Due Process Clause, and (iii) the First and Fourteenth Amendments. The Complaint easily meets and surpasses the requirements of *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662. The arguments in Point III of the Defendant's Motion are not properly heard on a motion to dismiss, s*ee* Motion at 31–44, as they address the merits as opposed to the sufficiency of the pleadings. However, AIG will address the Department's arguments because they are so unpersuasive that they illustrate that AIG's claims are not just viable, but compelling.

### A.   AIG's Amended Complaint States A Claim That DFS's Interpretation And Enforcement Of The New York Insurance Law Violates The Dormant Commerce Clause

Defendant's Motion does not seriously contend that its interpretation and enforcement of the New York Insurance Law would survive dormant Commerce Clause scrutiny absent express congressional permission.[30] Instead, he asserts that the McCarran-Ferguson Act (the "Act"), 15 U.S.C. §§ 1011–1015 (providing, *inter alia*, that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business"), "immunize[s]" any state statute or regulation that touches on insurance.

---

[30]   Superintendent Lawsky's reliance on *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 785–88 (3d. Cir. 1999) is misplaced. *See* Motion at 32. *A.S. Goldmen* implicated New Jersey's concerns regarding fraudulent conduct by a New Jersey registered broker under its blue sky laws and is factually distinguishable. Unlike in *A.S. Goldmen* where a key aspect of securities transactions occurred in New Jersey (the sale), *see id.* at 788, here all key aspects of insurance policy issuance and delivery—underwriting, contracting, and premium collection—occurred outside New York. Am. Compl. ¶¶ 34–36; *see also In re Nat'l Century Fin. Enters., Inc., Inv.* (footnote continued)

Motion at 42–44.  Defendant's argument misperceives the Act and, if accepted, would effect a drastic and unprecedented expansion of states' authority to regulate foreign commerce.

> **1.    The McCarran-Ferguson Act Does Not Immunize DFS's Conduct, For It Is Limited To Authorizing A State's Regulation Of Its Own Insurance Markets**

In *F.T.C. v. Travelers Health Ass'n*, 362 U.S. 293 (1960), the Supreme Court reviewed in detail the background and purpose of the McCarran-Ferguson Act and made several important observations that demonstrate that the Act does not bar the claims here.  The Court began by noting that the McCarran-Ferguson Act was passed in 1945 "to allay doubts, thought to have been raised by [the Supreme Court's] decision of … *United States v. South-Eastern Underwriters Ass'n*, 332 U.S. 533 (1944), as to the continuing power of the States to tax and regulate the business of insurance." *Id*. at 299.  The Court explained that Congress passed the Act believing "that the States were in close proximity to the people affected by the insurance business and, therefore, were in a better position to regulate that business than the Federal Government."  *Id*. at 302.  Congress recognized, however, that this localized benefit would "hardly be served by delegating to any one State sole legislative and administrative control of the practices of an insurance business affecting the residents of every other State in the Union." *Id*. at 301–02.[31]  Thus, the legislative history makes "clear that Congress viewed state regulation of insurance solely in terms of regulation by the law of the State where occurred the activity sought to be regulated.  *There was no indication of any thought that a State could regulate activities carried on beyond its own borders*." *Id*. at 300 (emphasis added).

> **2.    The McCarran-Ferguson Act Does Not Authorize A State To Regulate Foreign Insurance Activities**

There is nothing in the language or legislative history of the McCarran-Ferguson Act that authorizes DFS to force a company like ALICO—which was not doing an insurance business in

---

*Lit.*, 755 F. Supp. 2d 857, 884 (S.D. Ohio 2010) (noting that a state's blue sky laws can only be applied to transactions where the sale or purchase occurred within that state's borders).

[31]   Significantly, the report on the original house bill stated that Congress did not intend the legislation to displace limitations set forth in certain decisions of the Supreme Court, which (together) provided "that a State does not have power to tax contracts of insurance or reinsurance entered into outside its jurisdiction by individuals or corporations resident or domiciled therein covering risks within the State or to regulate such transactions in any way."  *Id*. (quoting H.R. Rep. No. 143, 79th Cong., 1st Sess. 3.).

New York within the meaning of Section 1102 and therefore was not required to have an insurance license—to become a New York licensed insurance company if it wants to conduct insurance activities exclusively outside of New York in foreign countries.  Not one case, including those cited by DFS, *see* Motion at 42–44, has ever found this to be constitutionally permissible; rather, the Act simply permits, for example, a State to charge foreign or alien insurance companies more than in-state insurance companies where the foreign or alien insurance companies are selling insurance products to that State's residents—and to this extent, it is an exception to the dormant Commerce Clause.[32]  As noted in the Amended Complaint, during the time ALICO was owned by AIG, ALICO was ineligible for a New York insurance license, because it did not write New York insurance.  Am. Compl. ¶¶ 3, 25.  Because the Act does not authorize a State to refuse to grant an insurance license to a foreign insurer writing insurance exclusively for foreign insureds while simultaneously penalizing that insurer for marketing its foreign insurance products, such conduct violates the dormant Commerce Clause.

**3.     DFS's Interpretation Of The New York Insurance Law Would Improperly Result In New York's Regulation Of Insurance Activities Occurring Entirely Outside Its Borders**

Despite the clear indication that Congress did not intend to open the door to limitless extraterritorial insurance regulation by the several States, Defendant contends that the McCarran-Ferguson Act did just that.  Taken to its logical conclusion, DFS's position is that the Act authorizes

---

[32]  In *S.E.C. v. Nat'l Secs., Inc.*, 393 U.S. 453, 460 (1969), upon which Defendant heavily relies, *see* Motion at 44, the court held that the McCarran-Ferguson Act did not apply to a state statute governing the relationship between an insurance company and its stockholders.  While the Supreme Court commented that statutes and regulations governing "[t]he selling and advertising of policies and the licensing of companies and their agents" come within the "business of insurance" for purposes of the Act, *id.* at 460 (citations omitted), the Court said nothing to suggest that a state could force a company to obtain an insurance license in a state where the company was not conducting an insurance business, simply because that company sought to conduct insurance business exclusively outside that state's borders in foreign countries (where the insurance business is already subject to regulation).  Similarly, in *W. & S. Life Ins. Co.*, 451 U.S. 648 (1981), the Supreme Court upheld a California statute that imposed a retaliatory tax on a corporation domiciled in Ohio and that was licensed and doing an insurance business in California.  While stating that "Congress removed all Commerce Clause limitations on the authority of the States to regulate and tax the business of insurance when it passed the" Act, the court, at the same time, noted that Congress passed the act "*[b]elieving that the business of insurance is a 'local matter, to be subject to and regulated by the laws of the several States.'*"  *Id.* at 654 (emphasis added).  And *F.T.C. v. Nat'l Cas. Co.*, a per curiam opinion, simply held that the Act authorizes a state to regulate insurance solicitation and advertising directed at its citizens within its borders.  357 U.S. 560, 563–64 (1958).  Superintendent Lawsky's interpretation and enforcement of the law here is far (footnote continued)

DFS to directly regulate activities carried on beyond its borders, by subjecting a company like ALICO—and all of its foreign branches already regulated by foreign governmental entities abroad—to New York's substantive insurance provisions applicable to all New York licensed insurers.[33] While the Act may permit state burdens on interstate commerce in insurance that are incidental to a state's regulation of insurance business within its borders,[34] DFS would go much further, and would directly impose all of New York's substantive insurance provisions on foreign insurance products already regulated by foreign regulators simply because ALICO engaged in marketing activities in New York.

The McCarran-Ferguson Act, however, was not intended to authorize to a State such expansive powers over activity that lacks any nexus to insurance activities occurring within that State's borders, as here. *See, e.g.*, *Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 749 (9th Cir. 2001) (upholding a California insurance law that applied to *California insurance companies* that affected foreign commerce indirectly and did "*not regulate foreign insurance policies, or control the substantive conduct of a foreign insurer, or otherwise affect the business of insurance in any country*") (emphases added.).[35] Limitations on a state's extraterritorial reach are well-founded, because the logic behind state insurance regulation—and the rationale underlying the

---

different from the statutes upheld in these cases, is flatly inconsistent with the "local" purpose of the Act, and falls outside the "scope of the congressional authorization." *W. & S. Life Ins. Co.*, 451 U.S. at 653.

[33] The substantive provisions of the Insurance Law applicable to all New York licensed insurance companies include, but are not limited to, restrictions on products the company can offer outside of New York, *see* N.Y. Ins. Law §§ 1106, 4205; compliance with the same investment requirements and limitations imposed on domestic insurers, *see id.* § 1413(a); and reserving methodologies that meet New York's standards, *see id.* § 4217.

[34] *See, e.g.*, *W. & S. Life Ins. Co.*, 451 U.S. 648 (upholding a California statute that imposed a retaliatory tax on a corporation domiciled in Ohio and that was licensed and doing an insurance business in California); *Robertson v. Cal.*, 328 U.S. 440, 448–49 (1946) (upholding a California law that required a California insurance broker license to sell insurance products to California citizens; "[t]he [unlicensed insurance salesman's] activities were of a kind that vitally affect the welfare and security of the local community, the state and their residents").

[35] *Low* was reversed on other grounds by *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 429 (2003) (holding that the statute violated the foreign affairs doctrine while noting that the statute passed muster under the McCarran-Ferguson Act because the statute "would qualify as regulating the 'insurance business' given its tangential relation to present-day insuring in the State" because the McCarran-Ferguson was not intended to allow a State to "regulate activities carried on beyond its borders"). In *Am. Ins. Assoc.*, the Department of Justice submitted an amicus brief asserting, *inter alia*, that the Act did not shield the state law aimed at regulating extra-territorial conduct from Commerce Clause scrutiny. *See* U.S. Amicus Brief, 2002 WL 32101013, at *14 (Dec. 12, 2002).

Act—disappears, where, as here, the direct effect would be to regulate exclusively foreign insurance activities that are unrelated to the New York insurance market.

For these reasons, the Act does not immunize DFS's interpretation and enforcement of the New York Insurance Law from dormant Commerce Clause scrutiny.  *See, e.g.*, *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004).

### B.     AIG's Amended Complaint States A Claim For Violation Of Due Process

Due Process requires that a statute or regulation have sufficient clarity to give an ordinary person fair notice of what is and is not prohibited.  *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (a "punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited" (quotations omitted)); *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that [all persons] are entitled to be informed as to what the State commands or forbids." (quotations omitted); *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law").  This requirement of fair warning ensures both that regulated parties know what is required of them, so they may act accordingly, and that laws are written with "precision and guidance," so that those enforcing the law do not act in an arbitrary and discriminatory way.  *F.C.C. v. Fox*, 132 S. Ct. at 2317.  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Id.*

The Department's interpretation of the New York Insurance Law violates these protections and is void for vagueness because no reasonably prudent person, familiar with the insurance industry and regulation, would understand the statutory scheme to require a New York insurance license for marketing activities that are exclusively directed toward out-of-state (in fact, out-of-country) employees of multinational companies.  To the contrary, with respect to insurance contracts, the language of Section 1101(b) is explicit.  The making of, or proposal to make, insurance contracts in

New York—which includes the issuance or delivery of policies or contracts from out-of-state insurance companies to New York residents—constitutes doing an "insurance business." *See* N.Y. Ins. Law § 1101(b)(1)(A) ("[A]ny of the following acts *in this state* ... shall constitute *doing an insurance business* ... : making, or proposing to make, as insurer, any insurance contract, including *either* issuance or delivery of a policy or contract of insurance to *a resident of this state or* to any firm, association, or corporation authorized to do business herein") (emphases added).

The statute is equally clear as to solicitation of insurance contracts—it applies only to solicitation of "such" contracts, meaning insurance contracts made in New York and issued or delivered to New York residents or companies. *See* N.Y. Ins. Law § 1101(b)(1)(A) ("or solicitation of applications for any *such* policies or contracts") (emphasis added). Thus, by the statute's plain terms, there are two, and only two, ways that an individual or entity does an "insurance business" under Section 1101(b)(1)(A): "*either*" by issuing or delivering a policy or contract of insurance to a New York resident or firm, association, or corporation authorized to do business in New York, "*or*" by "solicitation of *applications* for any *such* policies or contracts." *Id.* (emphases added).

No reasonable person reading that language would understand it to extend the definition of "doing an insurance business" so far as to reach the marketing activities at issue here, which involved insurance contracts issued outside of New York to and on behalf of non-New York insureds. Moreover, it was not until 2013, after AIG sold ALICO to MetLife, that DFS revealed its view that Sections 1101 and 1102 prohibited ALICO's conduct. Even worse, this new interpretation contradicted the position taken by DFS's predecessor, the Department of Insurance, that ALICO was ineligible for a New York insurance license. Am. Compl. ¶¶ 3, 25.[36]

This kind of bait-and-switch is exactly what the Due Process Clause prohibits. In *F.C.C. v. Fox*, the F.C.C. penalized Fox, for live awards ceremonies in which participants used expletives, and ABC, for a seven-second shot of a female character's nude buttocks and a brief shot of the side of her breast. 132 S. Ct. at 2314. However, at the time of the broadcasts, the Commission's indecency

---

[36]   Indeed, as AIG expects to demonstrate at the summary judgment stage, DFS's current stance is inconsistent with the understanding of prior Superintendents of the Department of Insurance.

guidelines stated that "whether the material dwell[ed] on or repeat[ed] at length" the offending description or depiction was a key consideration, and only after the broadcasts did the Commission determine that even fleeting expletives could lead to sanctions. *Id.* at 2318. The F.C.C.'s attempt to penalize Fox and ABC based on its new interpretation was unconstitutional because "[t]he Commission's lack of notice to Fox and ABC that its interpretation had changed so the fleeting moments of indecency contained in their broadcasts were a violation of Section 1464 as interpreted and enforced by the agency 'fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited.'" *Id.* (quoting *United States v. Williams,* 553 U.S. 285, 304 (2008)). The Court continued, "[t]his would be true with respect to a regulatory change this abrupt on any subject, but it is surely the case when applied to the regulations in question, regulations that touch upon "sensitive areas of basic First Amendment freedoms." *Id.* (citing, among others, *Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 870–71 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect")).

The Superintendent argues that because insurers had a "'reasonable opportunity' to understand the application of the Insurance Law," AIG's present suit is barred. Motion at 34–35. Whatever the merits of this argument in a conventional setting, it obviously has no force where the agency gives one answer, changes its mind, and then seeks to penalize conduct that was consistent with its first answer. Indeed, the F.C.C. statement on which Fox and ABC relied was "Industry Guidance" that the Commission issued to clarify its enforcement policies. 132 S. Ct. at 2313. The availability of such guidance, akin to what DFS claims is available to ALICO and other insurers,[37] did not play any role in the Supreme Court's decision in *F.C.C. v. Fox*.

---

[37] Or, at least, *was* available. The Department discontinued issuing advisory opinions in 2011. *See* Selected Opinions of the Office of the General Counsel, N.Y. Dep't of Fin. Servs., *available at* http://www.dfs.ny.gov/ insurance/ogcindx.htm (last visited May 20, 2014) (no opinions issued since September 26, 2011). Moreover, even when the Department issued the opinions, they were not authoritative statements of the law or binding on any court; they were merely informal advice from the Department. *State Farm Mut. Auto. Ins. Co. v. Mallela*, 175 F. Supp. 2d 401, 418 n.12 (E.D.N.Y. 2001) (declining to follow Department advisory opinion because it was "by its terms, 'informal and not binding on any court'"). Indeed, some New York courts decline to defer to an agency's interpretation of a statute if it involves "pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent," even where the agency has adopted the interpretation in a formal regulation, let alone an informal advisory opinion. *Lighthouse Pointe Prop. Assocs. v. N.Y. State Dep't of Envtl. Conservation*, 14 N.Y.3d 161, 176 (2010) (deference may be appropriate "where interpretation or application 'involves knowledge (footnote continued)

The Supreme Court rejected the F.C.C.'s attempt to impose retroactive penalties after it changed its interpretation of the statute.  This Court should reject the DFS's attempt to do so here.[38]

### C.   AIG's Amended Complaint States A Claim For Violation Of The First Amendment Protection Of Commercial Speech

The Amended Complaint finally states with adequate particularity a claim that DFS's efforts to penalize AIG (as ALICO's former parent) for ALICO's marketing activities violate AIG's First Amendment rights.

The Superintendent concedes, as he must, that "speech proposing a commercial transaction is indeed entitled to protection under the First Amendment."  Motion at 41; *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) ("Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment." (citation and quotations omitted)); *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) ("Speech likewise is protected even though ... it may involve a solicitation to purchase or otherwise pay or contribute money.").

Because ALICO was not eligible for a New York license during the period it was owned by AIG as it did not write insurance for New York insureds,  *see* Am. Compl. ¶¶ 24–25, DFS's threat to penalize AIG for marketing wholly foreign insurance products from or into New York without a New York license amounted to a penalty on speech and nothing but speech.  The Supreme Court has developed a canonical four-part test to determine whether a government regulation unconstitutionally penalizes such commercial speech:

---

and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom,'" but not for pure statutory construction) (citations and quotations omitted).  The materials Superintendent Lawsky relies upon are exactly the kind of "pure statutory reading and analysis" the Court of Appeals rejected in *Lighthouse*.

[38]   To the extent Superintendent Lawsky claims the Department's interpretation of Sections 1102, 2102, and 2117 have been consistent, this flatly contradicts paragraphs 25 and 37 of the Amended Complaint, which allege that the Department previously gave no indication that a company like ALICO required a license.  Such contradiction is impermissible in a motion to dismiss and should be ignored.  *Harris v. Mills*, 572 F.3d 66, 71–72 (2d. Cir. 2009) (on motion to dismiss, the court must "accept as true all of the allegations contained in the complaint.") (citing *Ashcroft*, 556 U.S. at 678).  Moreover, Superintendent Lawsky's assertion (Motion at 35–36 & n.22) that Sections 2117 and 2102 must be read and considered in isolation, entirely independent of Sections 1102 and 1101(b)(1) (and AIG's arguments related thereto), is unavailing.  This runs contrary to the well-established rule that provisions within a statutory scheme must be construed together, and DFS offers no support for departing from that rule here.

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of NY*, 447 U.S. 557, 566 (1980).

The first two elements of the *Central Hudson* test are plainly met here.  The speech at issue involves lawful activity—the sale of foreign life insurance products intended to cover foreign insureds in jurisdictions where ALICO is licensed, which policies are regulated by foreign insurance authorities—and there is no allegation that the speech was false or misleading.  Thus AIG's claims will turn principally on the third and fourth *Central Hudson* elements—whether the asserted government interest is substantial and closely tailored.  Here, DFS cannot rely on a purported substantial interest to protect New York consumers—the state interest that otherwise undergirds the New York licensing regime—since ALICO did not write insurance for New York insureds.  Am. Compl. ¶ 24; *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) ("[T]he State bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so to a material degree.  The need for the State to make such a showing is particularly great given the drastic nature of its chosen means—the wholesale suppression of truthful, nonmisleading information." (quotations and citations omitted)).  DFS's suppression of speech does not contribute to protecting any New York insured or other New York interest, because companies like ALICO do not provide goods or services to New York insureds.  New York does not prohibit an alien insurer from providing insurance abroad, yet DFS seeks to "prohibit[] the free flow of information that would inform that outcome."  *United States v. Caronia*, 703 F.3d 149, 167 (2d Cir. 2012).  That is exactly the kind of "ineffective or remote support for the government's purpose" that fails to satisfy *Central Hudson*'s third factor.  *See id.*; *see also 44 Liquormart*, 517 U.S. at 504–05.

But even if DFS had a substantial interest in protecting out-of-state insureds from false or misleading insurance solicitations (it does not), DFS's outright ban on the marketing activities of insurers who engage in wholly foreign insurance is plainly not narrowly drawn to accomplish that

goal. There is no allegation that ALICO's marketing activities were false or misleading, or that they harmed anyone inside or outside of New York; to date, ALICO is carrying out its business activities without interruption despite not being licensed, *see* Am. Compl., Ex. B. "The State cannot regulate speech that poses no danger to the asserted state interest, nor can it completely suppress information when narrower restrictions on expression would serve its interest as well." *Central Hudson*, 447 U.S. at 545 (citation omitted); *see also Walker v. Flitton*, 364 F. Supp. 2d 503, 510 (M.D. Pa. 2005) (prohibition against solicitation by unlicensed agents violated commercial speech rights where there was no evidence that Pennsylvanians experienced harm from unlicensed solicitation of preneed funeral services). Moreover, Defendant's complete ban on the activities at issue is far more extensive than necessary to protect against misleading marketing statements, particularly since companies conducting activities in New York are otherwise subject to the full array of civil and criminal laws governing false statements and fraud. *See Central Hudson*, 447 U.S. at 570 ("In the absence of a showing that more limited speech regulation would be ineffective, we cannot approve the complete suppression of Central Hudson's advertising."). DFS seeks to ban speech far beyond what it purports to prevent and instead would ban all speech of any kind. That is precisely what *Central Hudson*'s fourth factor is designed to address. *See id.* at 570–71 ("To the extent that the Commission's order suppresses speech that in no way impairs the State's interest in energy conservation, the Commission's order violates the First and Fourteenth Amendments and must be invalidated…. In the absence of a showing that more limited speech regulation would be ineffective, we cannot approve the complete suppression of Central Hudson's advertising."); *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 280 (2d Cir. 2010) (statute that "bans speech beyond what the state's evidence purportedly addresses" fails *Central Hudson*'s fourth factor).[39]

Unable to overcome this settled case law, Defendant instead argues that the State may burden speech incidentally when it regulates commercial activity. Motion at 38–39. But in doing so, DFS

---

[39]   In addition to the allegations in the Amended Complaint, which more than suffice for purposes of motion to dismiss, *see* ¶¶ 49–51, 57, at summary judgment, AIG intends to submit expert testimony demonstrating that the Consent Order has had, and continues to have, a negative impact on insurers including AIG. That evidence will (footnote continued)

both disputes the factual allegations in the Complaint, *see* Am. Compl. ¶¶ 29–36, which is impermissible in a motion to dismiss, and assumes the very conclusion that AIG alleges is unconstitutional:  that ALICO was doing an insurance business in New York for which the State may now penalize AIG.  *See* Motion at 39–40.[40]

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

| | | |
|---|---|---|
| Dated: | New York, New York<br>July 7, 2014 | QUINN EMANUEL URQUHART<br>& SULLIVAN, LLP |

> /s/ *Michael B. Carlinsky*
> Kathleen M. Sullivan
> Michael B. Carlinsky
> 51 Madison Avenue, 22nd Floor
> New York, New York 10010
> Telephone: (212) 849-7000
> Facsimile: (212) 849-7100
> kathleensullivan@quinnemaunel.com
> michaelcarlinsky@quinnemaunel.com
>
> William A. Burck
> Lori Alvino McGill (*Admission Pending*)
> 777 6th Street, 11th Floor
> Washington, D.C. 20001
> Telephone: (202) 538-8000
> Facsimile: (202) 538-8100
> williamburck@quinnemanuel.com
> lorialvinomcgill@quinnemanuel.com
>
> *Attorneys for Plaintiff American*
> *International Group, Inc.*

---

further demonstrate that AIG has suffered, and continues to suffer, harm from DFS's violation of AIG's First Amendment rights.

[40]   The Department's argument that AIG cannot challenge the Department's unconstitutional application of the Insurance Law against AIG because the Department has not yet made a final determination in this case, *see* Motion at 36–37, is equally specious.  *See* Consent Order at 9, ¶ 18 ("DFS finds the foregoing acts and practices of MetLife, AIG, ALICO and DelAm violate N.Y. Ins. Law §§ 1102, 2102(a) and 2117.").